**FEDERAL TRADE COMMISSION,**
Plaintiff,

v.

**FIVE–STAR AUTO CLUB, INC.,**
Angela C. Sullivan Michael R.
Sullivan, Defendants.

No. 99 Civ. 1693(CM).

United States District Court,
S.D. New York.

May 17, 2000.

Elizabeth Hone, Washington, DC, James A. Kohm, Washington, DC, Russell Deitch, Federal Trade Commission, Washington, DC, for Plaintiff.

Benjamin Ostrer, Benjamin, Ostrer & Associates, Chester, NY, for Defendants.

## DECISION AFTER TRIAL

McMAHON, District Judge.

After a trial on the merits, held April 24–May 2, 2000, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

I. The Parties

  A. Plaintiff, the Federal Trade Commission, is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41 *et seq.* The Commission enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

  B. On March 8, 1999, Plaintiff filed suit against Five Star Auto Club, Inc. ("Five Star"), Michael Sullivan, and Angela Sullivan (collectively "Defendants") alleging that Defendants: 1) made false and misleading earnings claims to consumers; 2) made false and misleading promises to consumers that their program offered "everyone the opportunity to drive their dream vehicle for free;" 3) provided others with the means and instrumentalities to make the same deceptive claims; and 4) failed to disclosed to consumers that Five Star's pyramid structure would not allow many of Five Star's participants to achieve the benefits promised by Defendants. (Complaint Counts I, II, III, & IV).

  C. Five Star Auto Club began operations in late March or early April 1997. (MS Dep., pp. 39(5)-(9); *See* Stip. # 2). Five Star Auto Club was subsequently incorporated in the State of Delaware on December 2, 1997. (PX 1; MS Dep., pp. 37(22)–39(9); Stip. # 1). Until February or March 1999, Five Star's corporate headquarters were located in Michael and Angela Sullivan's home at 3 Dodge Street, Poughquag, New York. (PX 230, # 13 & # 14; MS Dep., p. 56(7)-(9); Stip. # 3).

  D. In February or March 1999, Five Star moved out of the 3 Dodge Street address. (PX 230, # 14; *See* Stip. # 3). At the time this action was initiated, the bulk of Five Star's equipment and documents were in storage at Arnoff Moving and Storage in Poughkeepsie, New York ("Arnoff"). (MS Dep., pp. 79(13)-(16), 143(21)–144(5); *See* Stip. # 4; Zlotnick Tstm.). The remainder of the corporation's documents and equipment were stored at 1 Taconic View Court, LaGrangeville, New York, the Sullivans' new luxury home that was under construction. (MS Dep., pp. 251(19)–252(6), 754(7)–765(22); PX 173; PX 174; *See* Stip. # 4; Zlotnick Tstm.)

  E. Defendants marketed Five Star as a program through which consumers could earn a substantial income and drive their dream vehicle for free. *Infra* at III(A)(1) & (2). Five

Star expanded through the sale of new memberships by current participants. (MS Dep., pp. 194(4)–197(24)). Participants recruited new members pursuant to the incentive structure created by Defendants' claims of driving your dream car for free and earning a substantial income. (Vander Nat Tstm.)

F. Defendant Michael R. Sullivan was the founder, president and sole shareholder of Five Star. (PX 230, #1 through #4; MS Dep., pp. 15(4)-(12), 39(10)–40(5); Answer ¶5; Stip. #5). Mr. Sullivan created the Five Star structure and was in charge of running Five Star's operations, working full time for Five Star from at least December 1997 through March 9, 1999. (PX 230, #16; MS Dep., pp. 16(1)-(6), 42(4)—43(10); *See* Stip. #6). Therefore, individually or in concert with others, Mr. Sullivan formulated, directed, controlled, or participated in the acts and practices of Five Star as detailed below, and did so at all times pertinent to this action.

G. From March 1997 through March 9, 1999, Michael Sullivan resided and transacted business in the Southern District of New York. (*Id.*; MS Dep., pp. 8(7)-(23), 56(7)-(9), 79(13)-(16), 143(21)–144(5); Stip. #7).

H. In 1984, Mr. Sullivan started Five Star Auto Leasing, Inc., through which he claimed to have brokered automobile leases between consumers and retail leasing and financial sources. (MS Dep., p. 28(4)-(25)). Mr. Sullivan was the founder, president and sole shareholder of Five Star Auto Leasing, Inc. (MS Dep., p. 28(4)-(15); Stip. #9). Five Star Auto Leasing, Inc. was dissolved in 1991. (MS Dep., pp. 29(15)-(18), 652(16)-(19); Stip. #9).

I. Starting in 1989, Mr. Sullivan did business as Five Star Consultants,

Inc. (MS Dep., p. 24(8)-(9); Stip. #8). Through Five Star Consultants, Inc., Mr. Sullivan engaged in various activities including multilevel marketing. (MS Dep., pp. 24(21)–28(3)). Mr. Sullivan is the president, vice-president, founder, and sole shareholder of Five Star Consultants, Inc. (MS Dep., p. 24(8)-(20); Stip. #8).

J. Angela Sullivan was the vice-president of Five Star. She responded to subpoenas from the Kansas and Illinois Attorney General's Offices providing an extensive description of Five Star's business practices and identifying herself as Five Star's vice-president. (AS Dep., pp. 32(8)–36(7); MS Dep., pp. 750(4)-(11), 752(22)–753(13); PX 171; PX 172; Stip. #10 & 11). Moreover, in these same responses, she identified herself and her husband as the two only people who have "directed, controlled, or otherwise supervised the business operations" of Five Star. (PX 171; PX 172).

K. Angela Sullivan signed an Answer to a civil suit filed by the State of New York State identifying herself as the vice-president of Five Star. (MS Dep., pp. 602(17)–604(13); PX 125, AS Dep., pp. 39(12)–40(18), 42(5)-(11)). Additionally, in his sworn financial statement on behalf of Five Star, Michael Sullivan stated that Angela Sullivan is the vice-president of Five Star. (MS Dep., pp. 628(11)–629(15); PX 129, Item 4; Stip. #12).

L. In addition to answering subpoenas on behalf of Five Star, Angela Sullivan did research, wrote checks, answered telephones, retrieved checks from the Post Office, made bank deposits and entered computer data for Five Star. (MS Dep., pp. 43(14)–44(21); AS Dep., pp. 43(25)–46(17), 51(2)-(4); PX 203). Therefore, individually or in concert with others,

Ms. Sullivan formulated, directed, controlled, or participated in the acts and practices of Five Star as detailed below.

M. From March 1997 through March 9, 1999, Angela Sullivan resided and transacted business in the Southern District of New York. (AS Dep., pp. 8(20)-(24); MS Dep., pp. 8(7)-(23), 56(7)-(9), 79(13)-(16), 143(21)–144(5)).

N. The Sullivans' children, Melissa, Laurie and Michael, as well as Laurie Sullivan's fiancee Rick Orobsco, all worked for Five Star. (MS Dep., pp. 54(1)–56(12), 595(16)–596(6), 680(1)–681(5); AS Dep., pp. 46(21)–48(8); PX 2; PX 137).

## II. Procedural History

A. On March 8, 1999, Plaintiff filed a complaint alleging that Defendants violated Section 5 of the Federal Trade Commission Act by engaging in deceptive marketing practices.

B. On March 8, 1999, Plaintiff also moved for an *ex parte* temporary restraining order ("TRO") prohibiting further misrepresentations, appointing a Receiver over Five Star, and freezing Defendants' assets.

C. On March 8, 1999, the Court issued a TRO prohibiting further misrepresentations, appointing a Peter B. Zlotnick ("Receiver") as Receiver over Five Star, and freezing Defendants' assets.

D. On April 5, 1999, the parties stipulated to entry of a Preliminary Injunction continuing the TRO's prohibition against misrepresentations, the appointment of the Receiver, and the freeze on Defendants' assets.

E. On April 9, 1999, Plaintiff filed an Amended Complaint adding Thomas Bewley, Judy Bewley ("Bewleys"), and Advance Funding, Inc. as Defendants, and adding a common enterprise count.

F. Plaintiff and the Bewleys have reached a settlement in this matter. Advance Funding, Inc. has not filed an Answer or participated in these proceedings.

G. On or about April 22, 1999, Defendants filed an Answer to Plaintiff's Amended Complaint denying all allegations.

H. After a hearing on November 24, 1999, on December 9, 1999, this Court modified the Preliminary Injunction having found that Defendant Michael Sullivan continued to promote the Five Star concept over the telephone and the Internet.

## III. Five Star's Business Structure

A. Defendants' Focus

1. First, Defendants promised, both explicitly and by implication, that Five Star made it possible for everyone to drive their dream vehicle for free, or for no more than $100 per month. (*See e.g.*, MS Dep., p. 68(12)-(14); PX 6B, p. 110–113; PX 8, pp. 8, 10, 11, 12, 17, 19, 42, 65–66; PX 9, pp. 5, 16, 17, 73–74, 75–76, 77–78, 89, 95, 98–99, 101, 103, 106, 107–108; PX 15; PX 100, p. 42; PX 134; PX 135; PX 230, # 23–26 (c)(d)(h)(m)(*o*)(ee) (ff)(gg)(kk)(nn)(oo); PX 7B, p. 142; PX 221C, pp. 19–20; PX 230, # 42; PX 6B, pp. 8, 98, 110–111, 112; PX 230, # 48; PX 15A, pp. 2A, 8, 155; PX 230, # 57)

2. Second, Defendants claimed that Five Star participants could make a substantial income from the sale of Five Star memberships. (*See e.g.*, PX 5C ($8,000 per month); PX 5D ($16K, $32K, 48K per month); PX 5F ($16,000, $24,000 and $32,000 per month); PX 5K ($8,000 per month); PX 5L ($180—$40,000 per month); PX 7B, p. 96 ("We've never been promoting ourselves as a get rich

quick, but, you know, this is a get rich slow program. If you're committed for the long haul, you'll all do very, very well."); PX 8, p. 17 ($180–$300 per month); PX 8, p. 19 ("Your bonuses and commissions could pay your $100.00 U.S. Member's Monthly Dues—plus you could receive Big Bucks every month."); PX 8, p. 20 ($2400 per month); PX 8, p. 21 ($180—$300 per month); PX 8, p. 48 ($2400 per month); PX 8, p. 72 ($2400 per month); PX 8, pp. 73–74 (over $250,000/year); and PX 8, p. 77 ($80,000 per month); PX 13 ($75,-000 up front and $60,000 per month); PX 9, p. 5 ("If I could show you how to virtually eliminate your costs in leasing a new vehicle, and at the same time earn a substantial income, would that interest you? Of course it would. Just get the facts on our new lease alternative and discover how you can ... **Drive you Dream Car for Free!**"); PX 9, p. 8 ("Get Rich Slow" not "Get Rich Quick."); PX 9, p. 17 ("Earn an unlimited income based on 25% bonuses for your primary sales. Huge residual income potential based on monthly commissions."); PX 9, pp. 94–95 ($180–$300), 106 ($180–$2400 per month); PX 9, p. 95 ("How would you like to graduate with a six figure income?" ... Talk to your parents ... Simply explain that your efforts combined with their small investment in a Five Star Auto Club Membership could easily finance your college education.); PX 13 ($75,000 up front and $60,000 per month); PX 15B, p. 16 (*"FSAC Consultants* **You Can Earn A Substantial Income** ..."); PX 15A, p. 173 ($100,000); PX 19, p. 7 ($180–$8,000 per month); PX 19, p. 23 ($16,000. $24,000 and $32,000 per month); PX 19, p. 33 ($16,000. $24,000 and $32,000 per month); PX 19, p. 56 ($180–$8,000 per month); PX 67 ("**What Kind Of Income Potential Is There With** Five Star ... Frankly, there is an unlimited income potential for those that WORK. No FREE RIDES for those who do not WORK. As with all real businesses, nothing comes fast, but for those who dedicate themselves for at least six month will see incredible long term results."); PX 206A ($8,000 per month); PX 226B, p. 10 ($24,000 per month); PX 226B, p. 10, p. 23 ("several thousand a month extra"); PX 226B, p. 10, p. 26 ($24,000 per month); PX 226B, pp. 10, 29–31 ($16,000, $24,000 & $32,000 per month); PX 245, p. 7 ($180—$300 per month).

3. Five Star purported to offer access to other services, such as roadside towing, specially-priced insurance, and even a dental plan. However, Five Star had little, if any, focus on any retail product. (PX 5, PX 8, PX 9, PX 19; PX 206; PX 223; PX 227B, p. 67; PX 245; *See* TB Dep., p. 166(6)-(17)). Michael Sullivan admitted at his deposition that he knew of very few Five Star participants who availed themselves of the various retail products (MS Dep., pp. 232–234), and these products were not emphasized in Five Star's promotional materials. Indeed, it seems quite clear that the retail products were included solely to stave off regulators. Michael Sullivan's own statements clearly demonstrate this point. "Again, our total focus on the surface has to be retail to appease all these overregulators." (PX 68). "The income claims are gone, and that's fine, but all reference to money had to be removed. Put it in the kit manual, but you can't have it on promotional materials that go out to everyone, including regulators." (PX 53).

B. Five Star's Fee Structure

1. Participants could join Five Star at three different levels: consultants,

members, and members-consultants. (MS Dep., pp. 85(6)–94(11); PX 8, pp. 3–6; Stip. # 15).

2. Consultants paid a $95 annual fee to Five Star. (PX 5K; PX 5Z; PX 6B, p. 103; PX 6B, p. 103; PX 8, pp. 11, 13, 17, 19, 21, 32–33, 46; PX 9, pp. 22, 89, and 103; PX 13; PX 21; PX 89, PX 97; PX 220B, p. 100; PX 222B; PX 226B, p. 10). In exchange for their dues, consultants had the right to receive commissions from the sale of memberships, (MS Dep., pp. 85(6)–87(15); PX 8, pp. 17, 21, 33; PX 9, pp. 85, 90, 103; Stip. # 16), but did not have the right to participate in Five Star's Vehicle Incentive Program ("VIP"), Reverse Value Lease ("RVL"), or Buyers Assistance Program ("BAP"). (MS Dep., p. 91(1)-(2); *See* Stip. # 17).

3. Defendants' own marketing material consistently shows fees of $95 for the Consultant position. For example, promotional material that Mr. Sullivan admitted both developing and approving for distribution states "[t]he good news is, Consultants Annual Dues are only $95." (PX 8, p. 17; PX 230, # 23–26(h)). The only Five Star material that Defendants could point to which they claimed made the $95 consultant fee "optional" is a certain version of the Five Star Application. (MS Dep., pp. 87(16)–90(15); PX 3). However, the application contains only the statement "[y]ou may register as a Consultant for $0 in states that require this option." Mr. Sullivan is not even able to say in which States this option was even available. (*Id.*)

4. Members paid a $395 annual fee to Five Star and in exchange received the right to participate in the VIP, BAP and RVL. (PX 8, p. 21; MS Dep., pp. 85(17)-(19) & 91(9)-(24)). Members could not earn commissions. (MS Dep., p. 265(11)-(12); PX 8, p. 21).

5. Member–Consultants paid a $490 annual fee to Five Star and in exchange received all the benefits of both consultants and members. (MS Dep., p. 188(4)-(7); PX 8, pp. 3 and 21; Stip. # 18).

C. The Vehicle Incentive Program

1. The promise that Five Star makes it possible for everyone to drive their dream car for free while earning a substantial income lies at the heart of the Five Star advertising scheme. *Supra* at III(A)(1). The VIP is the vehicle through which Defendants claim they can fulfill this promise. (*Infra* at III(C)(3); MS Dep., p. 68(12)-(14).) Michael Sullivan drives home this point in a letter to all new participants suggesting that they sell Five Star by asking: "Would you be interested in driving a new car for just $100.00 per month under a new Lease Alternative? Keep it simple by asking them just one question." (PX 19, p. 39).

2. In order to qualify for a VIP lease, Five Star participants were required to pay Five Star $100 per month starting the 10th of the month after they joined the VIP program. (Dep., 514(11)-(21); PX 8, pp. 5, 19). Participants could join the VIP program at three different times. (PX 8, p 5). First, Defendants encourage VIP participants to start paying monthly dues on the 10 h of the first month after enrollment. (PX 8, p. 19; PX 9, p. 53; PX 100). This option allowed member-consultants to start earning commissions on the sale of new memberships immediately. (PX 8, p. 5). Second, VIP participants could start paying $100 per month on the 10th of the month following establishment of a complete primary group. (PX 8, p. 5) Pursuant to this option, participants could not earn commissions on the sales necessary to establish their

primary group. (*Id.*) Third, VIP participants could wait until delivery of their VIP vehicle to start paying $100 per month. (PX 8, p. 5). Under this option, participants would have to pay their own down payment, security deposit and bank acquisition fees (estimated by Defendants at $2000 to $4000). (*Id.*)

3. Both Five Star's VIP program and the promise of a substantial income were predicated upon the receipt of these monthly dues. (Vander Nat Tstm.) The $100 per month dues were "the financial back bone of Five Star . . ." (PX 8, p. 19).

4. To qualify for a VIP lease, a consumer (at what I will call the "A" level) had to establish both a "primary group" and "secondary group" of new members. (MS Dep., pp. 61(3)–63(11); PX8, p. 20; PX 21). A member's primary group ("B" level) consisted of those new members whose memberships were purchased directly from the original member. (MS Dep., pp. 62(21)–63(4); PX 8, pp. 17, 19; PX 21). The number of members required in a consumer's primary group depended upon the cost of the desired vehicle. (PX 8, p. 20; PX 9, p. 103; PX 21; MS Dep., p. 243(3)-(20)). For example, in order to qualify to lease a $12,000 vehicle, a consumer had to directly sell three (3) new memberships. (*Id.*) In order to qualify to lease a $40,000 vehicle, a consumer had to sell twenty (20) new memberships. (*Id.*)

5. Additionally, a consumer participating in the VIP program had to establish a secondary group ("C" level) that was three time the size of his/her primary group in order to qualify to lease a vehicle for free or for $100 per month. (*Id.*) The secondary group consisted of new members who purchased their membership ei-

ther directly from the original participant or from an individual in the original participant's primary group. (*Id.;* PX 8, pp. 17, 19; PX 21; PX 47, p. 28.) A portion of the payments from a consumer's primary and secondary groups was supposed to be placed in escrow and used to pre-pay a 24 month lease when the consumer had a sufficient number of participants in his/her primary and secondary groups. (MS Dep., pp. 63(25)–64(8); 161(8)-(16); PX 8, p. 17; PX 47, p. 28). Thus, money collected from individuals who were recruited at the B and C levels were to be used to pay for automobiles being leased for individuals who were at the A level.

6. Despite Defendants' representations that participants' funds would be placed in escrow, they were not. Five Star had no accounting for participants' supposedly escrowed funds. (MS Dep., pp. 161(2)-(25), 162(22)–164(15), 389(25)–395(10); PX 5Z; PX12).

7. The vast majority of Five Star participants joined Five Star in order to access the VIP. (Consumer Tstm.; Tobin Tstm.). For example, of the 6,733 Five Star applications examined by Plaintiff, 5,816 (86%) showed participants completing one or more portions of the Five Star application indicating that they were participating in the VIP (5,112 Member–Consultants (96%); 571 Consultants (47%); and 79 Members (66%). (Tobin Tstm.; *See also* MS Dep., pp. 78(12)–80(12).)

8. In order to sustain the VIP program it was imperative that VIP participants recruit new members who also participated in the VIP program and/or attempted to earn commissions. Specifically, even if 100% of the payments received by a participant's downline were placed in escrow, less commissions paid on those

memberships, there would not be enough money placed in escrow to pre-pay for a VIP lease, unless at least a portion of that participant's downline was paying $100 per month VIP dues. (Vander Nat Tstm.). Moreover, Five Star's program anticipated that a consumer's primary group would recruit the consumer's secondary group. (*See e.g.*, PX 8, pp. 11, 17, 20, 21, PX 21, PX 234B.) The only incentive to recruit new members was to achieve a VIP lease and/or earn commissions; therefore, a consumer's primary group had to establish his/her own downline of recruiters. (Vander Nat Tstm.)

## D. Other Automotive Programs

1. Through the Buyer's Assistance Program ("BAP"), Five Star promised to save members money on the lease or purchase of a vehicle by facilitating the lease or sale through access to their network of over 4,000 dealers nationwide. (MS Dep., pp. 58(24)–59(12); PX 8, p. 17; PX 9, p. 103, PX 230, Adm. 23–26(oo) & (h)). In fact, Five Star had no independent dealer network, but accessed Autobytel and other Internet car buying services that provided price quotes on cars to anyone for free. (MS Dep., pp. 204(15)–295(16), 339(24)–343(6); PX 42; PX170, p. 30; Tobin Tstm.). Of course, there is nothing illegal about that; many consumers might prefer to pay someone with Mr. Sullivan's familiarity with the auto industry to do their purchasing or leasing research for them. There is no evidence in this record that would allow the Court to ascertain how many Five Star participants availed themselves of the BAP. However, this Court does not credit Michael Sullivan's testimony that a significant number of consumers ever used the BAP.

2. In late 1998, Defendants developed the RVL program. (PX 214). The RVL was an attempt to move those participants accessing the BAP into the VIP program. (PX 6B, p. 98; PX 214; PX 234B, p. 26; MS Dep. 69(17)–72(19)). Pursuant to this program, members could use the BAP to lease a vehicle for 24 months and then begin recruiting new members. (MS Dep., pp. 69(17)–74(5)). For each new member recruited over that number which Five Star required be present in a consumer's primary group to qualify for a VIP lease, Five Star promised to pay $295 toward the consumer's lease. (MS Dep., pp. 71(5)–74(5); PX 214). For example, to lease a $20,000 vehicle through the VIP program, a consumer had to have 8 members in his/her primary group and 24 members in his/her secondary group. (PX 8, p. 20). Therefore, if a consumer leased a $20,000 car through the BAP program, Five Star promised to pay $295 toward that lease for the ninth through the twenty-fourth members recruited into the consumer's downline. (MS Dep., pp. 69(17) 74(2)).

## E. Five Star's Commission Structure

1. Five Star promised to pay consultants a $100 commission for each new membership they sold directly. (MS Dep., pp. 85(19)–86(7); PX 8, p. 17; *See* Stip. # 19). Additionally, consultants were promised a $20 per month commission for each $100 per month payment made by each member in their secondary group. (MS Dep., pp. 86(20)–87(15); PX 8, pp. 17, 21, 46–47; PX 51). This $20 commission increased to $40 when a consumer had 20 or more members in his/her secondary group. (*Id.*)

2. Five Star's promotional materials focus on the theoretically large earnings that they claimed could be

achieved through the $20 and $40 per month commissions. (*See e.g.*, PX 8, pp. 17, 21, 47, 77; PX 9, pp. 21, 91, 103; PX 21, PX 19, pp. 7, 23, 33, 56; PX 226B, pp. 30–33.) Defendants made numerous monthly earnings claims ranging from $180 per month to $80,000 per month. *Supra* at III(A)(2).

3. These monthly commissions were dependent upon participants' recruiting others who in turn would also attempt to recruit new members, because these commissions were to be paid only if a consumer's downline participated in the VIP program (thus making the $100 per month payments from which monthly commissions are derived). (Vander Nat Tstm.)

## IV. Defendants' Course of Conduct

### A. Marketing Materials

1. Five Star assisted participants in recruiting new participants by providing access to and/or selling promotional materials including: letters, brochures, audio tapes, video tapes, door hangers, and weekly conference calls. (PX 8, p. 7; PX 9, p. 31–37; MS Dep., pp. 120(17)–122(5)).

2. From April 1997 through November 1997, Five Star promotional materials were developed and distributed directly by Michael Sullivan. (MS Dep., pp. 95(21)–98(2); 243(3)-(20); PX 21; Stip. # 20). At this time, the VIP program was called the AIP program. (MS Dep., p. 243(10)-(13)).

3. From December 1997/January 1998 through the beginning of August 1998, Five Star promotional materials were developed by Kevin Cole and Michael Sullivan and distributed by Kevin Cole operating as Five Star Marketing Offices, Inc. and Dancole Networking, Inc. in Laugh-

lin, Nevada. (MS Dep., p. 96(10)-(14), 97(23)–101(21), 105(3)–110(8); PX 19, pp. 10–11 & 39–45). Mr. Cole was the National and International Marketing Director for Five Star from approximately December 1997 through the beginning of August 1998. (PX 50; PX 230, # 29; Stip. # 21).

4. In communications with Five Star participants, prospective participants, and the public, Michael Sullivan referred to Kevin Cole as Five Star Auto Club's National Marketing Director. (MS Dep., pp. 240(3)–241(8), 432(3)-(20); PX 19, p. 41, PX 65; PX 206E; Stip. # 22). Additionally, Mr. Sullivan referred to Mr. Cole's operation as Five Star's new Marketing Offices in Nevada and Five Star Marketing Offices. (*Id.*; MS Dep., pp. 157(24)–158(7); 369(23)–371(18); Stip. # 23).

5. Mr. Sullivan claims to have had problems with Mr. Cole's operation of Five Star's marketing offices starting in January/February 1998. (MS Dep., p. 101(17)–103(19), 239(15)-(17)). In late July 1998, after a discussion with Michael Sullivan, Thomas Bewley went out to Laughlin, Nevada to remove Kevin Cole from his position as Five Star's Marketing Director. (MS Dep., pp. 106(10)–108(12), 336(22)–339(1); PX 41; Stip. # 24). During the first week of August 1998, Mr. Bewley succeeded in removing Kevin Cole from his position as Five Star's Marketing Director. (MS Dep., pp. 106(10)–108(12); TB Dep., pp. 92(2)-(3), 99(18)-(24)). Thereafter, Thomas Bewley took over Mr. Cole's operation in Laughlin, Nevada. (MS Dep., pp. 110(9)–111(2); PX 5A; PX 55; PX 59; PX 60; 208; TB Dep. pp. 132(23)–133(9), 185(6)-(25); *See* Stip. # 25).

6. From August 1998 through November 1998, Five Star promotional ma-

terials were developed by Thomas Bewley and Michael Sullivan and distributed by Thomas Bewley from Laughlin, Nevada.[1] (MS Dep., pp. 110(9)–111(2), 111(15)–112(2); PX 5A; PX 59; PX 60; PX 61; PX 62; PX 67; PX 68; PX 72; PX 73; TB Dep., pp. 129(13)–130(21); Stip. # 26).

7. When Mr. Bewley took over operation of the marketing offices, he continued to send out old materials with Mr. Sullivan's permission. (MS Dep., pp. 425(24)–426(22).

8. On November 2, 1999, Thomas Bewley and his wife, Judy Bewley, moved Five Star's marketing department to 737 E. Avalon Avenue, Muscle Shoals, Alabama, and ran the business as Five Star Automotive Research & Information Consultants ("FSARIC"). (MS Dep., p. 11(8)-(14)). Michael Sullivan suggested that the Bewleys use the name FSARIC which he was already using in conjunction with Five Star. (MS Dep., pp. 427(2)–428(9), 437(16)–439(6); PX 62; PX 69).

9. The Bewleys distributed Five Star marketing materials, hosted a Five Star conference, participated in weekly training teleconferences with Five Star members, responded to consumer inquiries and ran Five Star's funding division until March 9, 1999. (MS Dep., pp.110(9)-(17), 111(15)–112(17); 458((15)-(23); PX 90; TB Dep., pp. 228(18)–229(20), 326(1)–327(9), 361(9)–363(8), 364(2)–367(18), 470(13)–471(10)).

10. Thomas Bewley held himself out to Five Star participants, prospective participants and the public as Five Star's International Marketing Director. (PX 5A; PX 8, p. 23; PX 9, pp. 4, 8, 93; PX 207; PX 212; PX 217; PX 222B; PX 223, pp. 127, 129, 130; TB Dep., pp. 132(23)–134(12), 253(7)-(21)). Michael Sullivan knew that Mr. Bewley was holding himself out as Five Star's International Marketing Director and both approved of and never objected to Mr. Bewley's doing so. (PX 9, pp. 4–5; PX 230, # 24–26(o); TB Dep., p. 185(6)-(25)).

11. With Michael Sullivan's permission, Thomas Bewley used the name Five Star Auto Club in correspondence. (MS Dep., pp. 594(25)–595(15); PX 122; Stip. # 28).

12. In communications with Five Star participants, prospective participants and the public, Michael Sullivan referred to Thomas Bewley as Five Star's Marketing Director or Marketing Manager. (PX 50; PX 65; PX 9, p. 24; TB Dep., pp. 185(6)-(25), 432(3)-(20); Stip. # 27).

13. In communications with Five Star participants, prospective participants and the public, Mr. Sullivan also referred to Mr. Bewley's Nevada, and later Alabama operations, as Five Star's Marketing Department or Fulfilment Office. (MS Dep., pp. 158(8)-(15); PX 6B, pp. 108–109; PX 9, p. 4; PX 16; PX 65; PX 230, # 23–26(o); PX 216; PX 223, p. 127; Stip. # 29). Additionally, Michael Sullivan specifically authorized Mr. Bewley to send out certain materials, such as PX 5d and PX 5e, identifying Mr.

---

**1.** Michael Sullivan admits that he helped create or develop and approve for distribution at least the following marketing materials: PX 8, pp. 3–6; PX 8, pp. 8–9; PX 8, p. 10; PX 8, pp. 14–15; PX 8, pp. 16–17; PX 8, pp. 28–31; PX 8, pp. 32–35; PX 8, pp. 38–78; PX 9, p. 3; PX 9, pp. 4–5; PX 9, pp. 6–7; PX 9, pp. 18–19; PX 9, p. 20; PX 9, pp. 21–23; PX 9, p. 29; PX 9, pp. 38–39; PX 9, pp. 48–72; PX 9, pp. 73– 74; PX 9, pp. 75–76 and 79; PX 9, pp. 77–78; PX 9, pp. 80–83; PX 9, pp. 84–87; PX 9, pp. 94–95; PX 9, pp. 96–97; PX 9, pp. 100–101; PX 9, pp. 102–103; PX 21; PX 230, Adm. 24–26; Stip. # 34 & # 35. This Court does not credit the testimony of Michael Sullivan that he did not approve, or that he disapproved, other false and misleading advertising materials.

Bewley as Five Star's International Marketing Director, to all Five Star participants. (MS Dep., pp. 125(8)–126(1); Stip. # 30).

14. Consultants, members, and member-consultants all received Five Star's marketing kit containing Five Star promotional materials. (MS Dep., p. 117(14)-(7); Stip. # 31). These marketing kits were sent by the marketing offices, first in Nevada and then in Alabama. (MS Dep., p. 117(14)-(7); Stip. # 31). The marketing kits contained multiple copies of marketing materials and were intended to be used by participants to sell Five Star memberships. (MS Dep., pp. 120(17)–122(5)).

15. Michael Sullivan contracted with Kevin Cole to send out marketing kits to all new Five Star participants. (MS Dep., pp. 100(16)–101(14)). Mr. Sullivan sent Mr. Cole lists of all new participants and Mr. Cole was to send materials to each. (MS Dep., p. 101(13)-(14)). Five Star was to pay Mr. Cole $25 for each marketing kit that was sent out. (MS Dep., p. 105(3)-(15)). Starting in August 1998, Michael Sullivan had the same or similar agreement with Thomas Bewley. (MS Dep., p. 110(6)–112(14), 117(14)-(7); Stip. # 33).

16. PX 5, PX 9, PX19 and PX 206 are examples of Five Star marketing kits that were sent to consumers. (MS Dep., pp. 240(3)-(20); TB Dep., 618(6)–621(3); Stip. # 32). PX 19 and PX 206 were sent from Nevada during Kevin Cole's tenure. (PX 19; PX 206; Stip. # 32). PX 5 was sent out from Nevada during Thomas Bewley's tenure. (MS Dep., pp. 116(14)–117(5); PX 5; Stip. # 32). PX 9 was sent out from Alabama during Thomas Bewley's tenure. (MS Dep., pp. 209(6)–210(7); PX 9; Stip. # 32).

17. The materials marked PX 5; PX 8; PX 9; PX 19, pp. 4–68; PX 21; PX 206; PX 223, pp. 120–158; and PX 245, pp. 3–33 were all Five Star marketing materials that were sent to Five Star participants and prospective participants from Five Star in New York or by Five Star's marketing offices in Nevada and Alabama. (Stip. # 36; MS Dep., pp. 95(21)–98(2), 116(14)–117(21), 209(6)–210(7), 234(3)-(20), 240(3)-(20); Ireland Tstm.; Vera Tstm.; TB Dep., pp. 37(6)-(19); PX 230, Adm. 40 & 41).

18. The Court finds that materials containing misleading and inflated earnings claims were sent to consumers well after 1997, which Sullivan contends was the time after which earnings claims were limited to $300 per month.

B. Websites

1. Five Star used *http://home1.gte.net/vgs/drv4free.htm* as its first corporate website, (MS Dep., pp. 388(22)–389(7); PX 47; Stip. # 37), and later maintained a site on the World Wide Web at *http://www.autoclub.net.* (MS Dep., pp. 222(16)–223(7); PX 15A, pp. 2A—12; PX 15B, pp. 13–20; Stip. # 37). Michael Sullivan approved content before it was posted on the corporate website. (MS Dep., p. 227(3)-(5)). PX 15A and PX 15B are true and correct copies of Five Star's website located at URL *http://www.autoclub.net* as they appeared on January 19, 1999, and February 24, 1999, respectively. (PX 15A; PX 15B; PX 230, # 57; Stip. # 38).

C. Conference Calls and Inquires

1. Michael Sullivan, Thomas Bewley and Kevin Cole hosted weekly conference calls for participants and prospective participants regarding

the marketing of Five Star. (MS Dep., pp. 89(18)–90(2), 112(9)-(25); Stip. # 39). Exhibits PX 7B; PX 226A and 226B; 227A and 227B; and PX 6A and 6B are tapes and transcripts of such conference calls. (*See* Stip. # 40; *See* PX 230, # 42 & # 48; Vera Tstm.).

2. Michael Sullivan and Thomas Bewley fielded consumer inquiries from Five Star participants and prospective participants. (MS Dep., pp. 42(4)-(13); TB Dep., pp. 364(22)–365(8)).

### D. Conferences And Conventions

1. In April 1998, Five Star held its first annual convention at Bally's hotel in Las Vegas, Nevada. (MS Dep., pp. 777(4)-(11), 780(3)-(4); Stip. # 41). Both Michael Sullivan and Kevin Cole spoke at the convention and each of their presentations was videotaped. (MS Dep., pp. 780(5)-(18); Stip. # 42). The videotape was subsequently sent out to Five Star participants. (MS Dep., pp. 780(5)-(18); Stip. # 44) PX 192 is a fair and accurate copy of that video tape. (Stip. # 45; Consumer Tstm.).

2. In February 1999, a Five Star training conference was held in Alabama. (MS Dep., p. 781(4)-(9); Stip. # 46). Michael Sullivan, Thomas Bewely and Rob Black made presentations at this conference. (MS Dep., p. 782(10)-(22); Stip. # 46). Additionally, an individual made a presentation explaining a Five Star flip chart. (MS Dep., p. 782(23)-(25)). These presentations were all videotaped and have been marked PX 193. (TM Dep., pp. 10(18)–11(25); MS Dep., p. 783(5)-(21); *See* Stip. # 46).

### E. Failure To Disclose

1. Defendants never disclosed to consumers that Five Star's structure ensures that in numerous cases consumers cannot qualify for a VIP lease nor make a substantial income. (Consumer Tstm.).

2. In fact, Defendants do just the opposite. Defendants regularly state that Five Star is not an MLM (Multilevel Marketing Program). (PX 1, pp. 39–41; PX 8, p. 8; PX 9, p. 44; PX 165, p. 5; PX 47; PX 166, p. 8; 227B, pp. 49–50). This insistence is based on the fact that many MLM's are not credible businesses and are associated with pyramid schemes—which Defendants acknowledge are illegal. Mr. Sullivan, outlines his thinking in a letter to Five Star participants which states: "The importance of knowing how to explain the difference is obvious, but I don't think many will argue with the fact that the references to MLM have become tainted over the years. All too often, MLM has been associated with the many pyramid schemes popping up every day in the industry ... MLM is not a credible business for many of these newly unemployed professionals." (PX 1, pp. 39–40).

## V. Five Star's Participant Records

### A. Five Star's Computers

1. On March 9, 1999, the Receiver, through his representative, served Michael Sullivan with a written demand for all outstanding corporate assets and documents. (MS Dep., p. 250(10)-(23); PX 23; Cohen Tstm.; Stip. # 49). That same day, Michael Sullivan informed the Receiver's representative that the Sullivans had no Five Star assets or papers in their possession and that all corporate assets, not already in the Receiver's possession, were in the Arnoff Moving and Storage facility. (Cohen Tstm.)

2. On March 19, 1999, the Receiver gained access to Arnoff, and found only one computer in the storage facility. (Zlotnick Tstm.; Flores Tstm.; MS Dep., pp. 250(14)–251(18)). An Arnoff employee informed the Receiver that Michael Sullivan brought the computer into the warehouse just the night before. (Zlotnick Tstm.) When confronted with this fact, Mr. Sullivan admitted it was true, but claimed he had suddenly found the computer in the garage at 1 Taconic View Court. (*Id.;* MS Dep., pp. 251(19)–252(6)). The last entry in the computer was made on March 15, 1999, six days after service of the TRO. (Flores Tstm.) Additionally, all of the e-mail on that computer had been deleted on March 15, 1999. (Flores Tstm.)

3. After the Receiver secured possession of the one computer in the warehouse, Mr. Sullivan once again claimed that there were no other computers containing Five Star data. (*Id.*) The Receiver then asked Mr. Sullivan how he had managed to post messages on Five Star's website in defiance of the Court's TRO during the previous week. (*Id.*) Mr. Sullivan informed the Receiver that he had used his son's lap top computer, but denied that it contained any Five Star information. (*Id.*) The Receiver demanded the lap top which, after some debate, was finally produced. (*Id.*) The lap top computer contained, almost exclusively, Five Star business files. (*Id.*)

B. Computer Database

1. The first computer recovered by the Receiver at Arnoff's contained a database purchased from Netmark. (MS Dep., pp. 253(15)–254(25); Zlotnick Tstm.). Defendants used this database to keep track of information concerning Five Star participants, participants' downlines, pay-ments to Five Star and commissions paid by Five Star. (MS Dep., pp. 253(15)–254(13); *See* Stip. # 52).

2. Five Star began using the Netmark database in April 1998. (MS Dep., pp. 138(20)–141(17); Stip. # 51). Prior to April 1998, Five Star used a different database to keep track of participant information. (*Id.;* MS Dep., pp. 288(19)–289(12)). The Receiver has not been able to identify this earlier database. (Zlotnick Tstm.)

3. Customer information, such as names, addresses and identification numbers from the previous database, were input into the Netmark database. (MS Dep., p. 289(4)-(9)). The Netmark database, therefore, contains information regarding all Five Star participant names, addresses, telephone numbers, identification number, titles, and downlines. (MS Dep., pp. 253(15)-(17), 294(18)–296(25), 299(14)–300(22); *See* Stip. # 50 & # 53).

4. As of March 9, 1999, Five Star had 8,261 participants, of which 5,301 joined Five Star as member-consultants, 2815 joined Five Star as consultants, and 133 joined Five Star as members. (Blumenthal Tstm.; Zlotnick Tstm.; MS Dep., pp. 299(14)–300(22)).

5. As of March 9, 1999, 123 Five Star participants had recruited a sufficient number of members into their downlines to qualify for the lowest priced lease available through the VIP program. (Blumenthal Tstm.; *See* MS Dep., p. 396(12)-(15)). Of these 123 participants, six were consultants, and therefore, not eligible for a VIP lease. (Vander Nat Tstm.; Blumenthal Tstm.) The remaining 117 consumers were all member-consultants. (Vander Nat Tstm.; Blumenthal Tstm.)

6. Between $609,000 and $865,000 was paid in commissions to Five Star

participants. (Blumenthal Tstm., Vander Nat Tstm., Zlotnick Tstm.; PX 236A.)

7. Mr. Sullivan admits that no Five Star participant ever made $16,000 per month or more. (MS Dep., pp. 130(4)-(16).) Additionally, he admits that $8,000 per month was not a typical amount made by Five Star participants. (MS 616(8))-(14)). Michael Sullivan claims he does not know whether $1760 per month, $960 per month, $500 per month, or $180 per month were typical of earnings of Five Star participants nor what percentage of participants made these amounts. (MS Dep., pp. 617(8)–618(12).)

8. According to Five Star's records, 94% of consultants and 95.5% of member-consultants never earned back their annual dues payment. (Blumenthal Tstm.; Vander Nat Tstm.) Additionally, over 99.5% of consultants and 96.2% of member-consultants never earned $540 (3 × 180) or more. (Blumenthal Tstm., VanderNat Tstm.; Tobin Tstm.; PX 231A; PX 236A.) Additionally, 98.4% of member-consultants failed to earn at least $1080 (6 × 1080.) (Blumenthal Tstm., Vander Nat Tstm.; PX 37: PX 231; PX 231A; PX 236A.)

VI. Five Star Is A Pyramid Scheme

A. Five Star derived its income from the sale of memberships and consultancies. The vast majority, if not all, of the participants who purchase memberships and consultancies did so for the purpose of recouping benefits from Five Star that far exceed their payments (i.e., commissions and free leases). (Consumers Tstm.; Vander Nat Tstm.; Tobin Tstm.) Achieving these benefits, however, required the recruitment of new members with the same aspirations. (Vander Nat Tstm.) Consequently, there would not and sequently, there would not and could not be sufficient funds in Five Star to fulfill Five Star's promise for any particular individual, unless there were a greater number of participants in the two levels below that individual to subsidize his/her benefits. (Vander Nat Tstm.)

B. Moreover, Five Star's funding mechanism is not sufficient to meet is anticipated costs, further demonstrating that Five Star is a pyramid scheme. (Vander Nat Tstm.)

C. Five Star's structure, therefore, ensures that at least 90%, and probably closer to 98%, of Five Star participants at any given time will not be able to qualify for a VIP lease. (Vander Nat Tstm.). This same structure also ensures that at least 90% of Five Star's members at any given time will be losing money. (Vander Nat Tstm.)

D. In order to obtain the lowest priced vehicle for "free" through Five Star, the original participant needed to recruit three new members directly, and these three new members needed to recruit an average of three new members each. *Supra* at III(C)(4) & (5). If, however, each Five Star participant recruited only three new members, Five Star would have 387,000,000 members between the 17th and 18th levels of recruitment, which exceeds the populations of the United States and Canada. (Vander Nat Tstm.) Therefore, Five Star was doomed to collapse. (Vander Nat Tstm.)

E. Because Five Star's structure must lead to its eventual collapse, at least 90% of Five Star participants, and probably closer to 98%, can never obtain a VIP lease; at lease 90% of Five Star participants, and probably more, will lose money. (Vander Nat Tstm.)

VII. Five Star Has Been Found to Be a Pyramid Scheme by Various State Regulators

A. Notice From State Agencies

1. Michael Sullivan received an Order To Show Cause from the State of Nevada Department of Business and Industry Consumer Affairs Division dated October 22, 1998, regarding the operation of Five Star as a "pyramid promotional scheme." (PX 161; MS Dep., p. 722(5)-(10)). After receiving PX 160, no changes were made to Five Star's structure. (MS Dep., pp. 722(5)–724(24)).

2. Prior to January 12, 1999, Michael Sullivan received a Decision and Order from the State of Nevada Department of Business and Industry Consumer Affairs Division finding that "substantial evidence exists to support that Five Star Auto Club, Inc., Michael R. Sullivan, President is operating a pyramid operation in violation of NRS 598.100 et seq." (PX 161; MS Dep., p. 724(25)-(18)). After receiving PX 161, no changes were made to Five Star's structure. (MS Dep., pp. 724(25)–726(13)).

3. Michael Sullivan received a Cease and Desist Order from the State of Georgia dated October 7, 1998, regarding Five Star's operations "[s]oliciting, offering to sell, and selling a multilevel marketing program wherein the financial gains to the participants are primarily dependent upon the continued and successive recruitment of other participants ..." (PX 162; MS Dep., p. 728(5)-(13)). After receiving PX 162, no changes were made to Five Star's structure. (MS Dep., pp. 728(5)–730(23)).

4. Prior to the initiation of this suit, Michael Sullivan received a Notice Of Unlawful Trade Practices And Proposed Resolution from the State of Oregon Department of Justice regarding Five Star's operation as a "pyramid club." (PX 163; MS Dep., pp. 730(24)–731(8); PX 64). After receiving PX 163, no changes were made to Five Star's structure. (MS Dep., pp. 730(24)–735(23)).

5. Michael Sullivan received a Warning Letter from the Wisconsin Department of Agriculture, Trade and Consumer Protection dated January 20, 1998, regarding Five Star's operation as a "chain distributor scheme." (PX 166; MS Dep., p. 737(2)-(8)). After receiving PX 166, no changes were made to Five Star's structure. (MS Dep., pp. 737(2)–738(25)).

6. Michael Sullivan received a Notice of Intended Action And Opportunity To Cease And Desist dated February 4, 1998, regarding Five Star's operation as a "pyramid or chain promotion" from the State of Michigan Department of Attorney General. (PX 167; MS Dep., p. 741(2)-(8)). After receiving PX 167 no changes were made to Five Star's structure. *Infra* at VII(A)(8).

7. Michael Sullivan received a letter from the State Attorney, Fourth Judicial District of Florida, Special Prosecution Division dated August 21, 1998, regarding Five Star's operations as a "pyramid sales scheme." (PX 169; MS Dep., pp. 745(25)–746(2); PX 230, # 71). After receiving PX 169, no changes were made to Five Star's structure. *Infra* at VII(A)(8).

8. On or about August 24, 1998, Michael Sullivan received a letter addressed to Mr. Elkins from the County of Fresno Office of the Attorney General regarding Five Star's operation as a "pyramid." (PX 199; MS Dep., pp. 811(24)–813(20)). After receiving PX 199, no changes were made to Five Star's structure. (MS Dep., pp. 811(24)–813(20)).

9. Angela Sullivan received a subpoena from the Kansas State Attorney General's Office directed to Michael R. Sullivan, President–Founder Five Star Auto Club, dated October 1, 1998, and responded on October 7, 1998. (MS Dep., pp. 750(4)-(11), 752(22)–753(13); PX 171; AS Dep., pp. 32(8)–36(7); *See* Stip. # 11). *Supra* at VII(A)(8).

10. Angela Sullivan received a subpoena from the State of Illinois Attorney General directed to Five Star Auto Club dated August 3, 1998, and responded on August 17, 1998. (MS Dep., pp. 750(4)-(11), 752(22)–753(13); AS Dep., pp. 32(8)–36(7); PX 172; *See* Stip. # 10). *Supra* at VII(A)(8).

B. Prior Multilevel Marketing Participation

1. Michael Sullivan is an experienced participant in multilevel marketing programs. (PX 41A). By his own admission, he has joined at least the following multilevel marketing companies: The Grocery Club, Apollo International, Alphen International, United Dental Program, Stairway Independent Distributor, Power Learning Systems, Fax Power and Vision 2000. (MS Dep., pp. 761(10)-(15), 763(1)–764(21), 768(17)–771(6), 771(7)–772(10), 774(11)–775(19), 803(7)–804(25), 806(8)–807(6), 807(19)–809(20); PX 177; PX 178; PX 179; PX 180; PX 184; PX 185; PX 194; PX 195A; PX 195B; PX 196A; PX 196B; and PX 197).

2. Mr. Sullivan recruited significant downlines in at least two of the multilevel marketing programs in which he participated. (PX 190, PX 191).

VIII. Defendants Are Not Credible

A. Michael Sullivan

1. In a sworn financial statement, Michael Sullivan states that no corporate officers have received any salaries or draws from Five Star. (PX 129, Item 14; MS Dep., pp. 628(11)–629(15)). Yet, Mr. Sullivan has taken or attempted to take large amounts of Five Star assets for his personal use. (*Infra.* at IX(B)(1)(c), IX(B)(2)(a), IX(B)(3); MS Dep., pp. 18(14)–19(91), 653(7)–655(24)). These funds include at least $483,000 to build a new luxury home and $50,000 placed in Defendants' personal brokerage account. Sullivan also intended to transfer $750,000 to a living trust in his mother-in-law's name, although this transfer was never consummated. *Infra* at IX(B)(1)(c), IX(B)(2)(a), IX(B)(3).

2. Mr. Sullivan now claims that Angela Sullivan was not the vice-president of Five Star. Yet, in his sworn financial statement on behalf of Five Star, Michael Sullivan states that Angela Sullivan is the vice-president of Five Star. (MS Dep., 628(11)–629(15); PX 129, Item 4).

3. Mr. Sullivan was not even honest about his own identity in dealing with Five Star participants, using a pseudonym to berate a consumer. (PX 19, p. 64; MS Dep., pp. 244(24)–245(12)). Additionally, he was dishonest in his communications with Mr. Bewley, pretending that his frustration over Mr. Bewley's failure to provide a financial accounting was precipitated by communications with Five Star's accountants when, in fact, no such accountants existed. (MS Dep., pp. 466(8)–469(20); PX 83).

4. Within the past five years, Michael Sullivan was convicted of using a motor vehicle without the owner's permission in violation of Section 53a–119b of the Connecticut penal code. (PX 230, # 117; MS Dep., pp. 837((8)–839(17)). This crime involved dishonesty and false statements. Specifically, Mr. Sullivan

rented a car in Florida and reported it stolen, when, in fact, he simply kept the car. (*Id.*)

B. Angela Sullivan

1. Angela Sullivan now claims not to have been the vice-president of Five Star nor to have any knowledge of the Five Star scheme.

2. Ms. Sullivan responded to subpoenas from the Kansas and Illinois Attorney General's Offices identifying herself as Five Star's vice-president. (MS Dep., pp. 750(4)-(11), 752(22)–753(13); PX 171; 172; AS Dep., pp. 32(8)–36(7); Stip. # 10 & # 11). She has also signed an Answer to a civil suit filed by the New York State Attorney General's Office as the vice-president of Five Star. (MS Dep., pp. 602(17)–604(13); PX 125; AS Dep., pp. 39(12)–40(18); 42(5)-(11)).

3. Moreover, in response to requests for information from the States of Illinois and Kansas, Ms. Sullivan further identified herself and her husband as the only two people who have "directed, controlled, or otherwise supervised the business operations" of Five Star. (PX 171, PX 172).

4. Aside from this, there is no evidence in the record to connect Angela Sullivan with Five Star. However, she has benefitted from the use by Michael Sullivan of corporate assets for personal expenses, notably, the acquisition of a house in which the family currently resides (although title is held in the name of the builder pursuant to a lien).

IX. Defendants' Assets

A. Five Star Receipt Of Consumers' Money

1. Every check that Five Star received from March 1997 through March 1999 was deposited into Key Bank account # 323290013073 in the name Five Star Consultants ("Key Bank Account"). (MS Dep., p. 393(14)-(19); *See* Stip. # 54). Between April 1997 and March 1999, inclusive, $3,501,618.50.00 was deposited or credited to the Key Bank Account. (PX 233).

2. According to Michael Sullivan, from April 1997 through March 9, 1999, less than $100,000 of the funds deposited in the Key Bank Account were derived from sources other than Five Star. (MS Dep., pp. 670(8)–672(20); Stip. # 55). Notably, Mr. Sullivan admits that from December 1997 to March 1999, he only received approximately $600 to $700 in income from sources other than Five Star. (MS Dep., pp. 16(1)–17(1); Stip. # 56). From December 1997 until approximately August 1998, Angela Sullivan worked for Cornell Extension making approximately $12,000/year before taxes. (AS Dep., pp. 10(11)–11(12); MS Dep., pp. 17(2)–18(10) & 33(25)–34(1); Stip. # 13). She has not worked since. (*Id.*) During the December 1997 to March 1999 time period, no one in the Sullivan household, other than Angela Sullivan, was employed other than working for Five Star. (MS Dep., p. 18(11)-(13); Stip. # 14).

3. At the time the Key Bank Account was frozen pursuant to the March 8, 1999 TRO, the account contained $25,906.84. (Zlotnick Tstm.) As detailed below, much of the $3.5 million was moved into other accounts or assets by Michael Sullivan.

B. Defendants Moved Five Star Monies From The Key Bank Account Into A Number Of Different Locations.

1. Banks

a. Michael Sullivan opened account # 323290022116 at Key Bank in the

name of Advance Funding, Inc. with a $50,000.00 check written on the Key Bank Account in February 1999. (MS Dep., pp. 681(6)–683(14); PX 138; PX 139). Mr. Sullivan never held any position with Advance Funding, Inc. (MS Dep., pp. 682(11)-(13)). At the time the account was frozen pursuant to the March 8, 1999 TRO, the account contained $70,497.50. (Zlotnick Tstm.).

b. In October 1998, Mr. Sullivan transferred $750,000.00 in Five Star funds from the Key Bank Account to an account in his own name at First Union National Bank ("First Union"). (MS Dep., pp. 162(21)–164(15), 632(19)-(21) & 684(20)–687(2); PX 140). At the time the account was frozen pursuant to the March 8, 1999 TRO, the account contained $727,974.00. (Zlotnick Tstm.; Stip. # 57).

c. In February 1999, Mr. Sullivan wrote a check on the First Union account for $750,000.00 to a living trust for his mother-in-law, Mildred Alonzo. (MS Dep., pp. 706(4)–711(16); PX 157). This check was never cashed because the trust was not completed before the funds were frozen and taken over by the Receiver. (MS Dep., pp. 709(10)–710(24)).

d. Michael Sullivan opened bridged checking and money market accounts in the name of Five Star Auto Club, Inc. with M & T Bank in March 1998. (MS Dep., pp. 688(9)–692(16); PX 142). All the funds for these accounts came from the Key Bank Account. (MS Dep., p. 691(17)-(23)). At the time the account was frozen pursuant to the March 8, 1999 TRO, the account contained $9,512.53. (Zlotnick Tstm.)

e. Using Five Star funds from the Key Bank Account, Michael Sullivan opened account # 4290000379 in his own name at Premier Banking in November 1998. (MS Dep., pp. 692(17)–693(21); PX 144). Mr. Sullivan intended to use this account as a personal account. (MS Dep., p. 693(17)-(21)). At the time the account was frozen pursuant to the March 8, 1999 TRO, the account contained $3,153.41. (Zlotnick Tstm.) After March 8, 1999, the Court released $2,800.00 to Defendants from this account pursuant to a stipulation between the parties to help meet living expenses. (Stip.# 58).

f. Using Five Star funds from the Key Bank Account, Michael Sullivan opened account # 429300000732 in the name of Five Star Consultants, Inc. at Premier Banking in December 1998. (MS Dep., pp. 697(5)–700(21); PX 148; PX 149; PX 150; PX 151; PX 152). At the time the account was frozen pursuant to the March 8, 1999 TRO, the account contained $90,000.00.

g. In December 1998, Michael Sullivan opened money market account # 4265000252 at Premier Bank in the Name of Five Star Consultants, Inc. (MS Dep., pp. 702(6)–703(7); PX 153). The monies deposited into this money market account were the same as those deposited into account # 429300000732. (MS Dep., pp. 703(8)–706(3)). At the time the account was frozen pursuant to the March 8, 1999 TRO, the account contained $10,028.97. (Zlotnick Tstm.)

2. Property

a. Michael and Angela Sullivan used at least $483,000.00 in corporate assets to pay KBL Corporation to purchase a new home at 1 Taconic View Court in LaGrangeville, New York. (MS Dep., pp. 676(15)–677(15)–$50,000; 677(16)–678(18)–$100,000), 687(7)–88(18)–$32,000; 754(7)–755(15)–$80,000; 756(23)–757(23)–$6056;

757(24)–759–$221,000; PX 134; 135; 141; 175; 176). Title to the property remains in the name of the builder, Kevin Lund or his corporation. (MS Dep., p. 6(13)-(14); Zlotnick Tstm.; Stip. # 61). There is no evidence that any funds other than funds belonging to Five Star were used to pay for construction of the Taconic View house. It is the finding of this Court that the funds used to purchase this house were a corporate asset of Five Star, and that any interest that either of the defendants has in the property at 1 Taconic View Court is the property of Five Star.

b. Since June 1999, Michael Sullivan, Angela Sullivan, as well as their daughter, granddaughter, and Mildred Alonzo have been living at the 1 Taconic View Property without paying rent. (MS, pp. 5(18)—8(6)).

c. Pursuant to the TRO and Preliminary Injunction issued in this matter, the Receiver has taken control of Five Star furniture and equipment with a liquidation value of approximately $2,000. (Zlotnick Tstm.; *See* Stip. # 62).

3. Brokerage Account

a. In November 1998, Michael Sullivan transferred $50,000 in funds derived from Five Star from the Key Bank Account to an E*Trade account held in the name of Michael and Angela Sullivan. (MS Dep., pp. 673(95)–675(1); PX 132). The E*Trade account was a personal investment for services rendered to Five Star by Mr. Sullivan. (MS. Dep., p. 674(3)-(5)). At the time the E*Trade account was frozen pursuant to the March 8, 1999 TRO, the account contained $53,000 in cash and securities. (Stip. 64; Zlotnick Tstm.) There is no evidence that any other source of funds were used to purchase the securities in the E*Trace

account. The Court finds that the E*Trade account is an asset of Five Star.

C. Frozen Assets Under the Receiver's Control

1. As of December 31, 1999, $600,-445.61 of the funds over which the Receiver had taken control remained in the Receiver's accounts. (Receiver's Tstm.) These funds include a bank account belonging to Angela Sullivan and Mildred Alonzo. The FTC has not traced any Five Star corporate funds into this account. The Court declines to find that the monies in this account belong to Five Star.

D. Other Assets

1. Michael Sullivan holds a trust account in his own name at Prosper International Limited in Nassau, Bahamas with a balance of $111 as of March 31, 1999. (MS Dep., pp. 711(17)–713(11); PX 158; Stip. # 63).

2. Angela Sullivan maintained two accounts at the Bank of New York in her own name: account # 6800997621 and account # 6871976242. (Zlotnick Tstm.; Stip. # 59). At the time the accounts were frozen pursuant to the March 8, 1999 TRO, the accounts contained $3,461.41 and $22.11, respectively. (Zlotnick Tstm.; Stip. # 60).

X. Consumer Losses

A. Five Star amassed approximately $3.5 million between April 1, 1997 and March 9, 1999. *Supra* at IX(A)(1).

B. Five Star paid between $609,000 and $862,000 in commissions to consumers between April 1997 and March 9, 1999. *Supra* at V(B)(6). In addition, certain Five Star par-

ticipants, who were "winners" under the pyramid scheme, took out another $400,000, more or less.

C. It is a reasonable approximation that Five Star participants experienced losses in the range of $2.9 million. (Vander Nat Tstm.)

D. The Court declines to consider additional evidence proffered by the defendants following the close of trial. The Court invited a response from the defendants to the damages presentation by the FTC, but did not authorize a reopening of the record. There is no testimony in the record to support the various "factual" assertions made in defendants' post-trial filing with the Court. Therefore, the Court cannot deem anything said therein to be competent evidence.

XI. Defendants' Post–Filing Activity

A. On March 9, 1999, Michael Sullivan, Angela Sullivan and Five Star were all served with a copy of the March 8, 1999 Temporary Restraining Order. (MS Dep., p. 250(10)-(23)). All three then stipulated to the April 5, 1999 preliminary injunction.

B. On April 29, 1999, the Receiver and Inspector Merrie Gordon of the New York Attorney General's Office visited the property at One Taconic View Court, LaGrangeville, New York. (Zlotnick Tstm.) In the open garage, the Receiver saw boxes of Five Star documents, and was able to conduct a quick review of those materials. (*Id.*) The Receiver then left the site, with the garage doors open (the same condition in which he had found them), and immediately called Kevin Lund, the builder of the house, to demand possession of the boxes. (*Id.*) Mr. Lund confirmed that he had allowed the Sullivans to store boxes in the Taconic View home, but informed the Receiver that he would have to speak with Mr. Sullivan before turning them over. (*Id.*) The next day, Mr. Lund turned over to the Receiver's agent a number of boxes from the Taconic View garage. (*Id.*) The boxes from the garage contained Five Star promotional materials, commission reports, un-sent commission checks, Advance Funding documents, and Five Star applications. (*Id.*)

C. A number of documents that the Receiver had viewed in the boxes in the garage just the day before were removed from the boxes before they were turned over. The missing documents included: 1) a Five Star time card for Rich Orobsco; 2) an original certificate of ownership to a $41,000 blue Mercedes–Benz automobile in the name of Five Star Consulting Inc.; and 3) draft living trust documents for each of the Sullivans and Ms. Sullivan's mother dated November 28, 1998. (Zlotnick Tstm.) None of these documents has been turned over to the Receiver or produced in discovery. (*Id.*)

D. Despite the Court's admonition not to contact Five Star participants, Michael Sullivan subsequently participated in nearly dozens of teleconferences with Five Star participants and communicated with Five Star participants by both regular and e-mail. (MS Dep., pp. 377(12)–388(21)). He did not preserve his written correspondence with Five Star participants. (MS Dep., 387(18)–388(13); PX 117).

E. Five Star, Michael Sullivan, and Angela Sullivan have not accounted for foreign assets pursuant to the April 5, 1999 Stipulated Preliminary Injunction. Additionally, Angela Sullivan has never supplied Plaintiff with a financial disclosure statement pursuant to the April 5, 1999,

Stipulated Preliminary Injunction in this matter.

F. After issuance of the Preliminary Injunction on April 5, 1999, Mr. Sullivan continued to participate in the operation of the Five Star structure through NUCAR4U, Team 5 Star, and AAAAA. (PX 114; PX 115; PX 116; PX 117; Zlotnick Tstm., MS Dep., pp. 542(1)–558(3)). Specifically, Mr. Sullivan was in the process of developing a new company to be called AAAAA prior to issuance of the March 8, 1999 TRO. (PX 108; PX 109; PX 110; PX 11; PX 112). Only hours after receiving the TRO, Mr. Sullivan wrote to Tom Bewley asking him to "Keep AAAAA under raps for now." (PX 114).

G. Several months later, the Receiver called a purported Five Star number forwarded to him by a consumer through Plaintiff's counsel. (Zlotnick Tstm.). Mr. Sullivan answered the call "Team Five Star." (*Id.*) The Receiver informed Mr. Sullivan that someone whom he had spoken with referred him to the Five Star website at a gallaxymall address. (*Id.*) Mr. Sullivan responded, "Oh, that must be one of our old websites. You should go to www.nucar4u.com to see our new website." (*Id.*)

H. The www.nucar4u.com website contained a description of AAAAA that is identical to Five Star. (PX 115; MS Dep., pp. 543(4)–544(2)).

I. Additionally, prior to March 8, 1999, Mr. Sullivan had been promoting Five Star through an entity called Team Five Star. (MS Dep., pp. 528(10)–533(19); PX 111).

J. The AAAAA website located at NUCAR4U.com contained a link to a Team5Star.com website. (PX 115, PX 116). The Team5Star.com website contained postings written by Michael Sullivan demonstrating Mr.

Sullivan's continuing connection to Team Five Star. (PX 116; MS Dep., pp. 550(3)–551(17)).

K. Moreover, after issuance of the TRO and Preliminary Injunction in this matter, Mr. Sullivan, using the Team Five Star name, contacted at least one Five Star participant and demanded that the consumer return the car he received through Five Star. (MS 117).

## CONCLUSIONS OF LAW

### I. JURISDICTION AND VENUE

A. The Court has Jurisdiction

1. This case was brought pursuant to Sections 5 and 13 of the Federal Trade Commission Act. 15 U.S.C. §§ 45(a) and 53(b). Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Section 13(b) of the FTC Act provides, "that in proper cases the Commission may seek and after proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b).

2. The Commission has alleged that Defendants violated Section 5 of the FTC Act by engaging in deceptive practices in marketing the Five Star scheme, and is seeking permanent equitable relief.

3. Defendants marketed Five Star to consumers throughout the nation, thereby affecting the passage of property or messages from one state to another. Such transactions are "in or affecting commerce," as required by the FTC Act.

4. This Court has subject matter jurisdiction in this matter.

5. The individual Defendants reside in Dutchess County, New York and the principal place of business of the corporate Defendant was also Dutchess County, New York.

6. This Court has personal jurisdiction over Defendants.

B. Venue is Proper

1. Under 28 U.S.C. § 1391(b)(1), a civil action not founded on diversity of citizenship may be brought in a judicial district where any defendant resides, if all defendants reside in the same state. For purposes of venue, a corporate defendant is "deemed to reside in any judicial district in which it is subject to personal jurisdiction." 28 U.S.C. § 1391(c).

2. The individual Defendants reside in this District and the corporate Defendant's principal place of business was in this District.

3. Venue is proper in this District.

II. DEFENDANTS VIOLATED SECTION 5 OF THE FTC ACT

■ A. In order to establish that Defendants engaged in deceptive acts or practices in violation of Section 5 of the FTC Act, the Commission must demonstrate: (1) a representation, omission, or practice; (2) that is likely to mislead consumers acting reasonably under the circumstances; and (3) that the representation, omission, or practice is material. *Cliffdale Assocs. Inc.*, 103 FTC 110, 164–165 (1984). *See also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994); *FTC v. Minuteman Press*, 53 F.Supp.2d 248, 258 (E.D.N.Y.1998).

■ B. It is not necessary to prove Defendants' misrepresentations were made with an intent to defraud or deceive, or were made in bad faith to establish a Section 5 violation. *See FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir.1988) *citing Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3rd Cir.1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *Remova-*

*tron Int'l Corp. v. FTC*, 884 F.2d 1489, 1495 (1st Cir.1989) *citing Chrysler Corp. v. FTC*, 561 F.2d 357, 363 (D.C.Cir.1977); *Regina Corp. v. FTC*, 322 F.2d 765, 768 (3rd Cir.1963); *FTC v. Patriot Alcohol Testers, Inc.*, 798 F.Supp. 851, 855 (D.Mass.1992).

C. The Commission has demonstrated by a preponderance of the evidence that Defendants violated Section 5 of the FTC Act by making the false and material claims that consumers participating in the Five Star program could "Drive [their] Dream Car for Free" and earn a substantial income (Counts 2 and 1, respectively). The Commission has also shown that Defendants violated the FTC Act by providing others with the means and instrumentalities to deceive others in order to perpetuate the Five Star scheme (Count 3). The Commission has further demonstrated that Defendants violated the FTC Act by failing to disclose the material information that because of Five Star's structure, the vast majority of participants had not and could not achieve the promised car or income (Count 4).

■ D. As Alleged in Counts I & II of the Complaint, Defendants Made Material Misrepresentations in Violation of the FTC Act

1. In Counts I and II of its Complaint, the Commission alleges that in violation of the FTC Act, Defendants falsely represented to consumers that by joining the Five Star program they could "Drive [their] Dream Car for Free" while earning substantial income.

*(1) Defendants' Claims Constitute Misrepresentations in Violation of Section 5 of the FTC Act*

1. As set forth in detail in the Findings of Fact, in marketing the Five Star program—through the development

and widespread distribution of marketing materials, the operation of web sites, the transmission of conference calls and the holding of conventions—Defendants falsely represented that consumers who paid to participate in the Five Star program could "Drive [their] Dream Car for Free," while earning substantial sums of money.

2. In truth, as evidenced by Defendants' own testimony, Defendants' computer database, and the testimony of Plaintiff's expert witness, only a small number of consumers who participated in the Five Star program earned "free" vehicle leases or more money than they paid to participate in Five Star, and even the few most successful consumers did not earn the huge sums of money in the upper range of Defendants' earnings claims.

3. Defendants suggest that they should not be held responsible for misrepresentations about the Five Star program made by others, and specifically for misrepresentations made by the Five Star Marketing Directors Kevin Cole and Thomas Bewley. Defendants' position is based on their assertions that both Mr. Cole and Mr. Bewley were independent contractors rather than employees of Five Star, and therefore not under Defendants' control, and that at least Mr. Cole sent out some material not authorized by Defendants.

4. However, for purposes of liability under the FTC Act, it does not matter whether Mr. Cole and Mr. Bewley would be considered at law as employees of the company or independent contractors. *See Goodman v. FTC*, 244 F.2d 584, 591–92 (9th Cir.1957). The law is clear that under the FTC Act, a principal is liable for misrepresentations made by his/her agents (i.e., those with the actual or apparent authority to make such representations) regardless of the unsuccessful efforts of the principal to prevent such misrepresentations. *See Standard Distributors v. FTC*, 211 F.2d 7, 13 (2d Cir.1954); *Goodman v. FTC*, 244 F.2d at 591–593. *See also Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1438–39 (9th Cir.), *cert. denied*, 479 U.S. 828, 107 S.Ct. 109, 93 L.Ed.2d 58 (1986). Indeed, it would be inappropriate for Defendants to hold out Mr. Cole and Mr. Bewley as Five Star representatives and to " 'reap the fruits from their acts and doings without incurring such liabilities as attach thereto.' " *Goodman*, 244 F.2d at 592 (*quoting International Art Co. v. FTC*, 109 F.2d 393, 396 (7th Cir.), *cert. denied*, 310 U.S. 632, 60 S.Ct. 1078, 84 L.Ed. 1402 (1940)).

5. The facts demonstrate that both Mr. Cole and Mr. Bewley acted as actual and as apparent agents of Five Star. It is undisputed that Michael Sullivan held both Mr. Cole and Mr. Bewley out to the public as Five Star's Marketing Directors and as operating Five Star's Marketing offices first in Nevada and then in Alabama. Moreover, Defendants have acknowledged that both Mr. Cole and Mr. Bewley sent out marketing material pursuant to financial arrangements made with them by Mr. Sullivan on behalf of Five Star, and that the vast majority of that marketing material was reviewed and approved by Mr. Sullivan. Defendants have even conceded that Mr. Sullivan was aware that Mr. Cole was sending out some marketing material with which Mr. Sullivan disagreed, yet Mr. Sullivan continued to contract with Mr. Cole to send out marketing materials, while doing nothing to notify consumers

that he objected to any of the representations that Mr. Cole was making about the Five Star program.

6. Indeed, according to Mr. Sullivan, once Mr. Bewley took over the marketing office, with Mr. Sullivan's approval, Mr. Bewley sent the remainder of the supposedly objectionable marketing material out to consumers.

7. Given Mr. Cole's and Mr. Bewley's actual and apparent authority to distribute marketing material for Five Star, Defendants are liable for the misrepresentations (and omissions) made by Mr. Cole, Mr. Bewley and their Five Star marketing operations.

8. Moreover, even that marketing material that Defendants acknowledge was "authorized" Five Star material contains repeated instances of the misrepresentations and omissions at issue here.

9. Thus, Defendants are liable for their own misrepresentations as well as those made by their agents.

*(2) Defendants Misrepresentations were Likely to Mislead Consumers Acting Reasonably Under the Circumstances*

1. In determining whether a misrepresentation is likely to mislead consumers acting reasonably under the circumstances, the Court must consider the misrepresentations at issue, " 'by viewing [them] as a whole without emphasizing isolated words or phrases apart from their context.' " *FTC v. Patriot Alcohol Testers, Inc.,* 798 F.Supp. at 855 (*quoting Removatron Int'l Corp. v. FTC,* 884 F.2d at 1496, quoting *Beneficial Corp. v. FTC,* 542 F.2d at 617.)

2. "Consumer reliance on express claims is [ ] presumptively reasonable." *FTC v. Int'l Computer Concepts, Inc.,* 1994–2 Trade Cas. (CCH) ¶ 70,798, ¶ 73,402 (N.D.Ohio 1994). "It is reasonable to interpret express statements as intending to say exactly what they say." *Id.*

3. Defendants' offers of a free dream car and substantial earnings were express, and indeed prominent in their marketing materials. Thus, as discussed in the Findings of Fact, consumers acting reasonably under the circumstances could be and were misled by Defendants' misrepresentations regarding consumers' opportunity to achieve the promised rewards of a free car and substantial earnings. Indeed, Defendants' scheme relied on consumers' believing that they could drive their dream car for free while earning substantial money.

4. Defendants would have this Court believe that their offers of the opportunity to obtain a "free" car and make money were not express claims, but hypothetical projections and, therefore, no consumers construed these projections as a guarantee. However, there is nothing in Five Star's voluminous marketing material suggesting that these claims were hypothetical. Moreover, at the very least it would have been reasonable for consumers to have assumed that the promised rewards were achieved by the typical Five Star participant. *See FTC v. Febre,* 1996 WL 556957, 1996 U.S. Dist. LEXIS 9487 (N.D.Ill.1996) *aff'd,* 128 F.3d 530 (7th Cir.1997) (conditional earnings claims would be understood to represent typical or average earnings and are therefore deceptive); *National Dynamics Corp. v. FTC,* 492 F.2d 1333, 1335 (2d Cir.), *cert. denied,* 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974) (holding that in its advertising defendant should be prohibited from making "deceptive use of unusual

earnings claims realized only by a few."); *Bailey Employment System, Inc. v. Hahn,* 545 F.Supp. 62, 70 (D.Conn.1982) *aff'd* 723 F.2d 895 (2d Cir.1983) (holding projected earnings claims were deceptive where such claims did not "bear a reasonable relationship to the average amounts earned in the past by a majority of existing franchisees.")

5. Thus, in *Ger–Ro–Mar, Inc. v. F.T.C.,* 518 F.2d 33, 38–39 (2d Cir. 1975), the Second Circuit upheld the FTC's finding that promotional materials illustrating how individuals could earn large sums of money were false and misleading in light of the severe earnings restrictions created by the defendants' pyramid structure. *See In re Ger–Ro–Mar,* 84 FTC 95, 145–46 (1974). The Court upheld a portion of an FTC Order that prohibited defendants from "[r]epresenting, directly or by implication, or by use of hypothetical examples or representations of past earnings of participants, that participants in any marketing or sales program will earn or receive, or have the reasonable expectancy of earning or receiving, any stated gross or net amounts, unless in fact, a majority of participants in the community or geographic area in which such representations are made, have achieved the stated gross or net amounts represented, and the representations accurately reflect the amount of time required by such participants to achieve such gross or net amounts." *Ger–Ro–Mar, Inc. v. FTC,* 518 F.2d at 38 n.7.

### (3) Defendants' Misrepresentations were Material

1. In addition to demonstrating that Defendants made these misrepresentations, the Commission must also show that the misrepresentations at issue were material.

2. "A claim is considered material if it 'involves information important to consumers and, hence, [is] likely to affect their choice of, or conduct regarding a product.'" *Kraft, Inc. v. FTC,* 970 F.2d 311, 322 (7th Cir. 1992), *cert. denied,* 507 U.S. 909, 113 S.Ct. 1254, 122 L.Ed.2d 652 (1993) (quoting *Cliffdale Assoc., Inc.,* 103 FTC at 165). *See also Pantron* 33 F.3d at 1095–1096.

3. The case law is clear that representations regarding the profit potential of a business opportunity are important to consumers, and therefore such are material misrepresentations in violation of Section 5. *See FTC v. Minuteman,* 53 F.Supp.2d at 258 ("misrepresentations—which tend to bear directly on the economic viability of the transaction under consideration— are both likely to deceive and material.") (*citing FTC v. Security Rare Coin & Bullion Corp.,* 1989– 2 Trade Cas. (CCH) ¶ 68,807 at 62,219 (D.Minn.)), *aff'd,* 931 F.2d 1312 (8th Cir.1991); *FTC v. Kitco of Nevada, Inc.,* 612 F.Supp. 1282, 1292 (D.Minn.1985). *See also FTC v. U.S. Oil and Gas Corp,* 1987 U.S. Dist. LEXIS 16137 (S.D.Fl.1987).

4. As evidenced by the focus of Defendants' own marketing material, the promises of receiving a free car and earning money were at the heart of marketing the Five Star scheme. Moreover, consumers' applications, declarations and complaints all evidence the fact that the these rewards were the reason why they joined Five Star.

5. Moreover, the fact that the vast majority of Five Star participants joined as member-consultants, qualifying them for the hypothetical right to qualify for a free car and earn commissions, demonstrates that these rewards were the primary lure

of the program. For those participants who joined as consultants, the only lure offered was the opportunity to earn commissions by recruiting others. The fact that virtually no one joined Five Star as just a member indicates that the services purportedly available to members (which were barely mentioned and never highlighted in the promotional material) were neither the focus nor the appeal of the Five Star program.

6. Defendants have submitted some evidence that some Five Star participants were satisfied customers, apparently in an attempt to show that no consumers were deceived. However, the FTC need not prove that every customer was injured. "The existence of some satisfied customers does not constitute a defense under the FTC [Act]." *FTC v. Amy Travel Service, Inc.,* 875 F.2d 564, 572 (7th Cir.1989). In fact, by the nature of a pyramid scheme, there should be participants at the top of the pyramid who were satisfied.

7. Moreover, the Commission need not prove that every consumer actually relied upon the misrepresentations to prevail. "Requiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of [Section 13(b)]." *FTC v. Figgie Int'l, Inc.,* 994 F.2d 595, 605–06 (9th Cir.1993) (*quoting FTC v. Kitco of Nevada, Inc.,* 612 F.Supp. 1282, 1293 (D.Minn.1985); *see also FTC v. Security Rare Coin & Bullion Corp.,* 931 F.2d 1312, 1316 (8th Cir.1991); *FTC v. Wilcox,* 926 F.Supp. 1091, 1105 (S.D.Fla.1995).

8. Therefore, as alleged in Counts I & II of the Amended Complaint, Defendants claims that consumers who paid to participate in the Five Star program could "Drive [their] Dream Car for Free," while earning substantial sums of money violated Section 5 of the FTC Act.

**E. As Alleged in Count III of the Complaint Defendants Violated the FTC Act by Providing Other Participants with Deceptive Means and Instrumentalities to Recruit Others into the Five Star Program**

1. In Count III of the Complaint, the Commission alleges that Defendants violated the FTC Act by providing participants with deceptive means and instrumentalities to recruit others into the Five Star program.

2. As a matter of law, "those who put into the hands of others the means by which they may mislead the public, are themselves guilty of a violation of Section 5 of the Federal Trade Commission Act." *Waltham Watch Co. v. FTC,* 318 F.2d 28, 32 (7th Cir.), *cert. denied,* 375 U.S. 944, 84 S.Ct. 349, 11 L.Ed.2d 274 (1963); *see also Ger–Ro–Mar,* 518 F.2d at 39 n. 7.; *Regina Corp. v. FTC,* 322 F.2d 765 at 768 ("One who places in the hands of another a means of consummating a fraud or competing unfairly in violation of the Federal Trade Commission Act is himself guilty of a violation of the Act.") (citations omitted).

3. As set forth in detail in the Findings of Fact, the key to the growth of Five Star was recruitment by participants of additional participants. In order to facilitate that recruitment, Defendants distributed and caused to be distributed Five Star marketing material to be used by those participants in recruiting additional participants. That marketing material included income claims and offers of "free" vehicles which, for the reasons described above, were de-

ceptive and material to consumers' decisions to participate in Five Star.

4. Therefore, in distributing that deceptive marketing material to be used in recruiting others into the scheme Defendants provided participants with the means and instrumentalities to deceive others in violation of the FTC Act as alleged in Count III of the Complaint.

F. As Alleged in Count IV of the Complaint, Defendants Violated Section 5 of the FTC Act by Failing to Disclose that in Numerous Instances Participants Would Neither Qualify for a Free Car nor Earn Substantial Income

1. In Count IV of the Complaint, Plaintiff alleges that in violation of Section 5 of the FTC Act, Defendants failed to disclose that due to the structure of the Five Star scheme, the vast majority of participants could not earn the promised rewards of a free auto lease and substantial income.

2. A material omission, like a material misrepresentation, that is likely to mislead consumers acting reasonably under the circumstances is a deceptive act under Section 5.

*(1) Defendants Failed to Disclose that the Vast Majority of Five Star Participants Could Neither Earn a Free Car nor a Substantial Income*

1. As demonstrated by the testimony and report of Plaintiff's expert witness, Dr. Peter Vander Nat, Five Star was nothing more than a minimally cloaked, and poorly designed pyramid scheme, in which a few of the consumers at the top of the pyramid were able to profit at the expense of the vast majority of participants.

2. A pyramid scheme is a mechanism used to transfer funds from one person to another. In the most extreme form of a pyramid scheme, there is no product or service; instead, people are motivated to join by promises of a certain portion of the payments made by those who join later and are placed in one's "downline." If enough additional people join the scheme, a given member could recoup his or her initial payment and even receive additional returns. But, by the nature of the scheme, those at the bottom of the structure at any given time will have lost money, and the number of consumers at the bottom who have lost money will grow exponentially as more people are recruited to join. Moreover, the required number of new members cannot, in fact, be recruited on a perpetual basis, causing the scheme to collapse of its own weight if it does not first falter when a significant number of members are unable to find enough people as gullible as themselves to recruit.

3. A legitimate multi-level marketing ("MLM") firm includes a system of distributing products or services in which each participant earns income from sales of a product to his or her downline and also from sales to the public. The operative question is whether the revenues from sales of the goods and services to consumers is sufficient to cover the production costs or costs of the goods sold, the various marketing expenses, and the promised rewards for recruiting new participants. If the revenue from such sales is sufficient, there is no structural certainty of collapse.

4. Defendants claim that their "retail product" includes the "Buyer's Assistance Program" which was allegedly received by consumers who purchased Five Star memberships, as well as advantages in insurance,

long distance rates, and the like. However, even under conditions most favorable to Defendants' position, sale of memberships/BAP was not sufficient to provide the promised rewards of a free car lease and substantial income.

5. Based on a thorough review of Five Star marketing material, the FTC's expert, Dr. Vander Nat, initially concluded that at least 90% of all participants would lose money and would not qualify for a lease. However, as Dr. Vander Nat explained, the higher the value of the car sought by the average participant, the greater the size of the bottom of the pyramid, and therefore the higher the percentage of participants who will lose money, and not receive their dream car.

6. Using the information available in the Five Star Netmark database, and some very conservative (i.e.pro-Defendant) assumptions, Dr. Vander Nat estimated that in fact 97.7% of all participants failed to qualify for a car, and that 95% of all participants lost money on the Five Star scheme. I find Dr. Vander Nat's testimony to be credible and I accept it.

**(2) Defendants' Failure to Disclose the Limitations of the Five Star Structure Had the Capacity to Mislead Consumers Acting Reasonably Under the Circumstances**

1. Failure to disclose pertinent information is deceptive if it has a tendency or capacity to deceive. *See Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (8th Cir.1979); *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3rd Cir.1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *Bailey Employment System, Inc. v. Hahn*, 545 F.Supp. 62, 67 (D.Conn.1982).

2. In evaluating a tendency or capacity to deceive, it is appropriate to look not at the most sophisticated, but the least sophisticated consumer. *See Exposition Press, Inc. v. FTC*, 295 F.2d 869, 872 (2d Cir.1961) *cert. denied*, 370 U.S. 917, 82 S.Ct. 1554, 8 L.Ed.2d 497 (1962); *see Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir.1993). *See also, Charles of the Ritz Distributors Corp. v. FTC*, 143 F.2d 676, 679–680 (2d Cir.1944). The evidence, including the consumer testimony offered by Plaintiff demonstrates that most consumers did not, and could not have been expected to understand that most participants in Five Star would not profit from the scheme.

3. As demonstrated by Plaintiff, most consumers had no way to identify the fundamental flaws in the Five Star scheme.

4. Therefore, Defendants' failure to disclose the structural flaws in the Five Star scheme were likely to and, indeed, did deceive consumers acting reasonably under the circumstances.

**(3) Defendants' Failure to Disclose the Limitations of the Five Star Structure Was Material**

1. The failure to disclose that most consumers would not achieve the rewards promised by Defendants is a material omission.

2. In particular, failure to disclose the true nature of a service or product can constitute a material omission. *See FTC v. Febre*, 1996 WL 396117, 1996 U.S. Dist. LEXIS 9487 (N.D.Ill.1996), *aff'd*, 128 F.3d 530 (7th Cir.1997). *See also Meckenstock v. International Heritage, Inc.*, 1998 U.S. Dist. LEXIS 21042, *14–15 (E.D.N.C.1998) ("a reasonable investor could consider the existence of a pyramid material.").

3. Common sense alone dictates that most consumers would not have joined Five Star had Defendants disclosed that due to the very structure of the scheme, the vast majority of

participants would neither receive substantial income, nor a free car. Further evidence of the materiality of this omission is provided by Defendants repeated assurances to consumers that Five Star was neither a pyramid scheme, nor a multi-level-marketing scheme.

4. Therefore, Defendants' failure to disclose that due to the structure of the Five Star scheme, the vast majority of consumers could not achieve the promised rewards of a free automobile lease and substantial income constituted a material omission in violation of the FTC Act.

III. THIS COURT HAS BROAD EQUITABLE AUTHORITY TO ORDER ALL INJUNCTIVE RELIEF NECESSARY, INCLUDING FINANCIAL RELIEF, TO REMEDY VIOLATIONS OF THE FTC ACT

A. Section 13(b) of the FTC Act provides, "that in proper cases the Commission may seek and after proof, the court may issue, a permanent injunction." 5 U.S.C. § 53(b).

B. This grant of permanent injunctive power gives the court broad equitable authority to "grant any ancillary relief necessary to accomplish complete justice." *FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1113 (9th Cir.1982). *See also FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1024–1026 (7th Cir.1988); *FTC v. United States Oil & Gas Corp.,* 748 F.2d 1431, 1434 (11th Cir.1984); *FTC v. Southwest Sunsites, Inc.,* 665 F.2d 711, 718 (5th Cir.), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 846 (1982).

C. Such equitable relief can include, among other things, bans, bonds, monitoring provisions, and reporting requirements. *See, e.g., FTC v. Micom,* 1997–1 Trade Cas.

(CCH) ¶ 71,753, at 79,335–6 (SDNY 1997) (defendants banned from selling any application services for obtaining government licenses and any investment that includes an interest in a government license, final order also includes bond provision and record keeping provisions); *FTC v. Alliance Communication, Inc.,* 1996 WL 812939, 1997–1 Trade Cas. (CCH) ¶ 71,685 (S.D.N.Y.1996) (final order includes permanent injunction, monitoring by the FTC and reporting by Defendants to the FTC); *FTC v. Wetherill,* 1993 WL 264557, 1993–1 Trade Cas. (CCH) ¶ 70,276 at 70,376 (C.D.Cal.1993) (Court agreed with FTC suggestion of a ban on defendant "from engaging, directly or indirectly, in any and all future involvement with telemarketing operations" in order to protect public from potential future violations by defendant).

D. Also, included in the Court's power to grant ancillary relief is the authority to "order payment for consumer redress or restitution." *FTC v. Febre,* 128 F.3d 530, 534 (7th Cir.1997); *Amy Travel Service, Inc.* 875 F.2d at 571. *See also FTC v. Micom,* 1997 WL 226232, 1997–1 Trade Cas. (CCH) ¶ 71,753, at 79,-335–6.

E. An Order Requiring Broad Equitable Relief, Including Redress, Against the Corporate Defendant is Appropriate

1. Given the fundamentally deceptive nature of the Five Star scheme, broad relief against Five Star is warranted.

2. As part of this Court's issuance of a temporary restraining order, and then a preliminary injunction, the Court previously appointed Peter Zlotnick as Receiver to operate Five

Star during the pendency of this litigation. The Court credits the Receiver's testimony that Five Star cannot be operated as a going concern without making the misrepresentations and omissions inherent in the Five Star scheme. Therefore, equity demands that the Court's Order reconfirm the Receiver's appointment and direct him to wind up the business of Five Star.

3. The proper amount of relief is the full amount lost by consumers. *FTC v. Febre,* 128 F.3d 530, 535–36 (7th Cir.1997); *FTC v. Gem Merchandising Corp.,* 87 F.3d 466, 468 (11th Cir.1996); *FTC v. U.S. Sales Corp.,* 785 F.Supp. 737, 753 (N.D.Ill. 1992)("... the proper amount of restitution has been held to be the purchase price of the relevant product or business opportunity, less any refunds or money earned."); *FTC v. Atlantex,* 1987 WL 20384, 1987–2 Trade Cas. (CCH) ¶ 67,788 at 59,256 (S.D.Fla.1987)(redress is "... measured by amounts previously paid less any amount returned to consumers ..."), *aff'd,* 872 F.2d 966 (11th Cir.1989).

4. Bank records demonstrate that Five Star took in at least $3,501,618 while in operation. The Five Star Netmark database shows that consumers received at least $609,000 in compensation from Five Star. As Plaintiff's expert witness testified, $2,892,618 is therefore a conservative estimate of the amount of money lost by consumers to the Five Star scheme. In point of fact, injury to consumers was probably greater both because the "profits" made by consumers in Five Star were concentrated in the hands of a few individuals, and because the FTC has not offered evidence of funds paid to Five Star's Nevada and Alabama marketing offices for marketing materials.

5. Defendants dispute the FTC's contentions regarding both the amount of money generated by the scheme, and the amount of injury suffered by consumers. In part, Defendants base their argument on the fact that the Five Star database used by the FTC in calculating commission payments was not complete. Yet, Defendants do not, and indeed cannot, offer a reasoned basis for another measure of either amount. Instead they offer a database that is also incomplete and which Mr. Sullivan acknowledges tampering with after the entry of the preliminary injunction in this matter. (The Court discounts the post-trial submission on damages for the reason stated above in the Findings of Fact).

6. Plaintiff has the burden of showing that its calculations reasonably approximate the amount of consumers' net loss. However, to the extent that the records kept by Five Star make it impossible to determine with certainty the exact amount of injury suffered by consumers, "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *FTC v. Febre* 128 F.3d at 535 citing *SEC v. First City Financial Corp., Ltd.,* 890 F.2d 1215, 1232 (D.C.Cir.1989). *See also SEC v. First Jersey Securities,* 101 F.3d 1450, 1475 (2d Cir.1996) *cert. denied,* 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997); *SEC v. Patel,* 61 F.3d 137, 139 (2d Cir.1995); *SEC v. Lorin,* 76 F.3d 458, 462 (2d Cir.1996).

7. This Court is therefore satisfied that the combination of the bank records and the database provide a reasonable approximation of the amount of consumer loss.

8. As a matter of equity, that money, the funds held by the Receiver (less the amount of the monies in the bank account jointly owned by

Angela Sullivan and Mildred Alonzo), as well as any additional Five Star funds that the Receiver can generate by other means, including sale of the assets of Five Star and its affiliates, or by pursuing claims held by Five Star (including its claim to the house at 1 Taconic View, LaGrangeville, New York), less the Receiver's fees, should be used to pay redress to the Five Star participants who lost money in this scheme and the Receiver should wind up the business of the corporation and its affiliates.

F. An Order Requiring Broad Equitable Relief, Including Redress, From Defendant Michael Sullivan is Also Appropriate

1. To hold individual defendants liable for injunctive relief, the Commission must establish: (1) that the individuals participated directly in the wrongful acts or practices or that the individual defendants had the authority to control the corporate defendants; and (2) that the individuals had some knowledge of the acts or practices. *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir.1989). *Accord FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir.1997). Assuming the duties of a corporate officer establishes authority to control. *Amy Travel* at 573; *Publishing Clearing House* at 1170. Intent to deceive is not a necessary element of an FTC violation, nor is it necessary to obtain injunctive relief against an individual. *Amy Travel* at 573.

2. Likewise, when considering an order of restitution, "imposing a requirement that the FTC prove subjective intent to defraud on the part of the defendants would be inconsistent with the policies behind the FTCA and place too great a burden on the FTC." *Id.* at 574. However, in order to hold individuals liable for restitution, the Commission must show that the individual "had or should have had some knowledge or awareness of the misrepresentations." *Id.* citing *Kitco*, 612 F.Supp. at 1292. "[T]hat knowledge requirement may be fulfilled by showing that the individual had 'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" *Amy Travel* at 574. *Publishing Clearing House*, 104 F.3d at 1171; *FTC v. American Standard Credit Sys.*, 874 F.Supp. 1080, 1089 (C.D.Cal.1994); *FTC v. Minuteman*, 53 F.Supp.2d at 259–260.

3. In this case, the Commission has shown that both Michael and Angela Sullivan meet the standard for being held liable for injunctive and monetary relief, and indeed the imposition of such relief is necessary and appropriate to provide a remedy and protect against future violations of the FTC Act.

*(1) Michael Sullivan*

1. The record is replete with evidence sufficient to hold Michael Sullivan individually liable for injunctive relief and consumer redress.

*(a) It is Appropriate to Hold Michael Sullivan Liable for Injunctive Relief*

1. Michael Sullivan had the requisite control of the corporation and knowledge of its bad acts to be held liable for injunctive relief.

2. It is undisputed that Michael Sullivan was the founder, president and

**536**

sole owner of Five Star, and as such had authority to control the corporate defendant. Moreover, Mr. Sullivan was the moving force behind the wrongful acts and practices of the corporation. He developed and executed the idea for the Five Star scheme, and spent the better part of two years working solely on Five Star. He drafted and/or approved the bulk of the marketing material, answered consumer inquiries, and held telephone conference calls and live conventions to encourage participants to recruit others into the scheme, all of which clearly indicates that Mr. Sullivan participated directly in the deceptive acts or practices of the corporation.

3. Therefore, Mr. Sullivan had the requisite level of participation and/or control over Five Star to hold him liable for injunctive relief.

**(b) Broad Injunctive Relief is Appropriate against Michael Sullivan**

1. Courts have broad authority to enjoin unlawful acts that may be anticipated from defendants' past conduct, and to model injunctive orders to fit the exigencies of a particular case. *See Kitco of Nevada, Inc.,* 612 F.Supp. at 1296. Indeed, the commission of past illegal conduct is highly suggestive of the likelihood of future violations. *See SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir.1975); *CFTC v. Co Petro Mktg. Group, Inc.,* 502 F.Supp. 806, 818 (C.D.Cal.1980). As the court noted in *FTC v. Wolf,* "[b]road injunctive provisions are often necessary to prevent transgressors from violating the law in a new guise." 1997–1 Trade Cas. (CCH) ¶ 71,713 at 79,081.

2. Moreover, courts have ordered broad bans on otherwise legitimate behavior based on the past conduct of defendants as a means of preventing potential future law violations. *See FTC v. Micom,* 1997 WL 226232, 1997–1 Trade Cas. (CCH) ¶ 71, 753, at 79,335-6 (S.D.N.Y.1997) (defendants banned from selling any application services for obtaining government licenses and any investment that includes an interest in a government license); *FTC v. Wetherill,* 1993 WL 264557, 1993–1 Trade Cas. (CCH) ¶ 70,276 at 70,376 (C.D.Cal. 1993) (Court agreed with FTC suggestion of a ban on defendant "from engaging, directly or indirectly, in any and all future involvement with telemarketing operations" in order to protect public from potential future violations by defendant).

3. In this case, broad injunctive relief against Michael Sullivan, including a prohibition on all multilevel marketing is appropriate. After participating in numerous multi-level marketing schemes, Mr. Sullivan developed, owned and operated his own multi-level marketing scheme that was deceptive to its core. He received numerous state law enforcement cease and desist orders, and other inquiries and did nothing to change Five Star's practices. Indeed, he continued to insist to consumers and to law enforcement authorities that Five Star was neither a pyramid scheme, nor a multi-level marketing scheme.[2]

4. Moreover, throughout the pendency of this litigation, Mr. Sullivan has ignored this Court's orders. After

**2.** The record demonstrates that Mr. Sullivan individually and, through various entities knowingly participated in numerous multi-level marketing schemes. Thus, the fact that

Mr. Sullivan insisted, and continues to insist that Five Star was not even a multi-level marketing scheme is quite incredible.

the Court entered a temporary restraining order, putting the Receiver in charge of Five Star, Mr. Sullivan posted a message on the corporate web site, and held a conference call with Five Star participants in violation of the TRO. Before entering the Preliminary Injunction which prohibits Defendants from operating Five Star or any scheme similar to Five Star, this Court admonished Mr. Sullivan not to contact Five Star members. Yet, after entry of that order, Mr. Sullivan participated in dozens of conference calls with Five Star participants, and exchanged correspondence with many participants. In further violation of the Court's Order, he did not maintain copies of that correspondence and turn copies over to the Receiver and the FTC. In November 1999, the Receiver presented evidence that Mr. Sullivan was operating the same scheme under the names Alternative Automobile Acquisition Advisory Association ("AAAAA"), Nu–Car–4U and Team Five Star. At that time, the Court found that Mr. Sullivan was continuing "to promote the Five Star concept (albeit under a modified name) over the telephone and the Internet, despite the pendency of the Court's injunction." Order Amending Preliminary Injunction. At the time, the Court modified the Preliminary Injunction in order to aid Mr. Sullivan's understanding of the comprehensive scope of the Injunction.

5. Given Mr. Sullivan's past violations of the FTC Act, his failure to even attempt to reform his program in light of extensive state law enforcement inquires, and his defiance of this Court's preliminary injunction, this Court will enter a broad order with the goal of both remedying past conduct and preventing future illegal conduct.

### (c) Michael Sullivan Should Also be Held Liable for Consumer Redress

1. It is also appropriate to hold Mr. Sullivan jointly and severally liable for monetary relief.

2. Even if this Court were to credit Mr. Sullivan's claims that he did not think he was doing anything wrong—and it does not credit those claims—the fact that Mr. Sullivan received almost a dozen cease and desist orders and inquiries of various kinds regarding Five Star's operations as a pyramid scheme, from state and local law enforcement authorities, demonstrates that Mr. Sullivan was recklessly indifferent to the truth, or had an awareness of a high probability of fraud coupled with an intentional avoidance of the truth.

3. Moreover, this Court finds quite incredible Mr. Sullivan's testimony that he thought, and indeed, still thinks, he was not engaged in an illegal activity. Mr. Sullivan's lack of credibility has been demonstrated in a number of ways. His own testimony demonstrates that while operating Five Star he had no compunction about deceiving consumers and business colleagues every day. Additionally, pursuant to the TRO and Preliminary Injunction entered in this matter, Mr. Sullivan presented the FTC with sworn financial statements claiming that he had received no income from Five Star. Yet, in his testimony, Mr. Sullivan concedes that he transferred $50,000 in Five Star funds to a personal brokerage account and used at least $483,000 in Five Star assets to purchase a new home.

4. There can be no doubt that Mr. Sullivan was at least "recklessly indifferent to the truth or. falsity of the representations" at issue.

5. Therefore, it is wholly appropriate to hold Michael Sullivan individually liable for monetary as well as injunctive relief in this matter.

### (2) Angela Sullivan

1. While indisputably less involved in Five Star than her husband, Angela Sullivan is also subject to injunctive relief and is liable for monetary relief to the extent she has benefitted from the misuse of Five Star corporate assets for personal expenses

### (a) It is Appropriate to Hold Angela Sullivan Liable for Injunctive Relief

1. Angela Sullivan both participated directly in the wrongful acts of Five Star, and as an officer of Five Star had authority to control the corporation.

2. The business of Five Star was run from Mrs. Sullivan's home for two years. Mrs. Sullivan answered Five Star's corporate phones, picked up Five Star's mail, did Five Star's banking and answered state inquiries about Five Star. Thus, she participated in the wrongful acts of the corporation.

3. Moreover, while Mrs. Sullivan now seeks to deny both substantive knowledge of the business and that she was a corporate officer, her current protests of noninvolvement with Five Star are belied by her conduct before and even after this law suit was filed. During the time the scheme was in operation, Mrs. Sullivan provided lengthy substantive responses about Five Star's business in reply to inquiries directed to Five Star by the States of Kansas and Illinois. Moreover, in those responses she identified herself as vice president of Five Star, and, in her response to the State of Illinois, Mrs. Sullivan identified herself and her husband as the only two who "di-rected, controlled, or otherwise supervised the business operations" of Five Star.

4. Even after the start of this litigation, Mrs. Sullivan executed a court filing, in a New York State case in which she is a defendant, again indicating that she was vice president of Five Star. In his sworn financial disclosure form on behalf of Five Star, Mr. Sullivan identified Mrs. Sullivan as a vice president of Five Star.

5. Based on Mrs. Sullivan's representations to the States of Kansas, Illinois and New York that she was a corporate officer of Five Star, the Court finds Mrs. Sullivan's current position that she was not a corporate officer of Five Star self-serving, unsupported by the evidence and lacking in credibility.

6. An individual's "assumption of the role of president . . . and her authority to sign documents on behalf of the corporation demonstrate that she had the requisite control over the corporation" to be held liable under the FTC Act. *FTC v. Publishing Clearing House,* 104 F.3d 1168, 1170 (9th Cir.1997) (holding individually liable a defendant who served as president of the corporation for only one week).

7. Thus, as an officer of Five Star, Mrs. Sullivan had the bare legal ability to control the corporate defendant; and given her response to state inquiries and her work with Five Star, this Court finds that she had some knowledge of Five Star's wrongful practices. Therefore, it is appropriate for Angela Sullivan to be held liable for injunctive relief in this case.

8. Moreover, given Mrs. Sullivan's demonstrated willingness to serve as a "front woman" in responding to law enforcement inquiries, in order to assure that Mr. Sullivan does not

seek to evade the conduct prohibitions and requirements imposed on him by this Court, it is necessary to impose those same requirements on Mrs. Sullivan.

### (b) It is Appropriate to Hold Angela Sullivan Liable for Monetary Relief

1. As to Mrs. Sullivan, the FTC has not proved by a preponderance of the evidence that she was personally involved in creating and disseminating the deceptive materials attributable to Five Star. Neither has the FTC demonstrated that Angela Sullivan performed anything other than ministerial tasks for Five Star. Nonetheless, Angela Sullivan, by virtue of her participation in the preparation of filings with and responses to State regulators, is found to have more than a minimal degree of knowledge concerning the various challenges to Five Star's legitimacy. At the very least she was recklessly indifferent to the falsity of the Five Star representations.

2. Mrs. Sullivan's claim that she lacked all knowledge of corporate practices is not credible. The business was run from her home for two years, and was her husband's sole employment during that time. Indeed, the whole family, including both her daughters and one of her daughter's fiancees worked for Five Star. Mrs. Sullivan herself engaged in certain ministerial tasks for the corporation and responded to the law enforcement inquiries by the States of Kansas and Illinois. Therefore, this Court finds that Mrs. Sullivan had enough knowledge of Five Star's violations of law for it to be equitable to hold her liable in damages to the extent that she enjoys or has enjoyed the fruits of Five Star funding in meeting the expenses of her personal life or in creating investment or other income from which she benefitted. These include any right, title or interest that she has in the house at 1 Taconic View, LaGrangeville, New York, because the evidence shows that Five Star funds were used to pay for this house and there is no evidence that Mrs. Sullivan personally contributed any separate earnings to the construction of the house. These also include the content of all bank and trading accounts held in joint name with her husband. These do not include the account that she held in joint name with her mother, Mildred Alonzo.

The FTC is hereby ordered to amend its proposed injunction to conform to the Court's Findings of Fact and Conclusions of Law, and to submit same for signing within ten (10) days of the date of this decision.